MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 17
Docket:        Yor-13-198
Argued:        December 17, 2013
Decided:       February 11, 2014

Panel:         ALEXANDER, LEVY,[*] SILVER, MEAD, GORMAN, and JABAR, JJ.


LEWIS LUBAR, TRUSTEE OF THE CLOVER TRUST

v.

FREDERICK W. CONNELLY


ALEXANDER, J.

[¶1]  Frederick W. Connelly appeals from a judgment of foreclosure and order of sale of his residence entered in the Superior Court (York County, *Fritzsche, J.*) upon the grant of a summary judgment, pursuant to M.R. Civ. P. 56(j) and 93, to Lewis Lubar, as trustee of The Clover Trust, on Lubar's complaint for foreclosure.

[¶2]  Connelly argues that the court erred in entering a summary judgment because (1) there are genuine disputes of material fact relating to affirmative defenses that Connelly asserts under fair lending and consumer protection statutes, primarily the Maine Consumer Credit Code, 9-A M.R.S. §§ 1-101 to 12-107 (2008), including whether the Trust was a creditor as defined in 9-A M.R.S.

---

[*]  Although not available at oral argument, Justice Levy participated in the development of this opinion.  *See* M.R. App. P. 12(a) ("A qualified justice may participate in a decision even though not present at oral argument.").

2

§ 1-301(17);[1] (2) Connelly is entitled to a trial on his equitable defenses; (3) there are genuine disputes of material fact regarding sums due on the note; and (4) Lubar did not produce admissible evidence necessary to support the entry of a summary judgment in a residential foreclosure action.

[¶3]   Because review of the summary judgment record demonstrates that genuine issues of material fact remain to be resolved before judgment may be entered on Lubar's complaint, we vacate the judgment of foreclosure and order of sale and remand for further proceedings.

## I.  CASE HISTORY

[¶4]   The following facts, which are supported by the summary judgment record, are presented in the light most favorable to Connelly as the nonprevailing party. *See Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 2, 66 A.3d 7.

[¶5]  Frederick W. Connelly was born in 1930.  He resided in Massachusetts until he retired in 1983, at which time he became a full-time resident of Maine.  He has lived in a house in Wells (the Wells Property) since 1990.  He lives on a fixed annual income of $25,476.  It appears from the record that, prior to the mortgage at issue here, the Wells property was not encumbered by any mortgage.

---

[1]  Among other provisions of the 2008 version of the Code, 9-A M.R.S. § 1-301(17) was repealed and replaced by P.L. 2011, ch. 427, § A-4 (effective Sept. 28, 2011) (codified at 9-A M.R.S. § 1-301(17) (2013)).

[¶6]  Connelly and his late wife have five children who are now adults.  One of Connelly's sons, Charles, is or was married to Susan Paratore Connelly.[2] Charles, Susan, and Susan's mother lived together in a house on Ivy Road in Belmont, Massachusetts (the Belmont Property).  In April 2007, the Belmont Property was titled in Susan's name, with a life estate to her mother.[3]  Connelly has never resided at the Belmont Property.

[¶7]   Charles and Susan were apparently having financial difficulties. Without Connelly's consent or knowledge, (1) Susan and her mother transferred the Belmont Property—purportedly for $750,000—to Connelly by deed dated June 25, 2007; (2) Charles, or someone acting in concert with him, forged a power of attorney (POA) dated June 27, 2007, that authorized Charles to purchase the Belmont Property on Connelly's behalf and to encumber that property with a mortgage loan of $480,000 in Connelly's name alone; (3) pursuant to the POA, Charles secured a mortgage loan, obligating only Connelly, from an entity called "Homecomings Financial, LLC"; and (4) Charles apparently retained the loan proceeds for his own use.  The record does not specify how many, if any, payments

---

[2]  To avoid confusion of last names in this opinion, Frederick Connelly will be referred to as "Connelly," Charles Connelly will be referred to as "Charles," and Susan Paratore Connelly will be referred to as "Susan."

[3]  Lubar admitted Connelly's statement of additional material facts indicating that the Belmont Property was titled in Susan's name in June 2007, but the deed attached in support was executed and recorded in April 2007.

4

were made, but Connelly began receiving collection calls just months after Charles obtained that loan. Charles assured Connelly that he would remedy the situation.

[¶8] At Charles's request, Connelly signed a piece of paper on January 22, 2008, which was the signature page of a quitclaim deed transferring the Belmont Property from Connelly back to Susan for one dollar. The first page of that deed incorrectly states that Connelly was a resident of Belmont, Massachusetts. Connelly does not recall having seen the first page of the deed when he signed the second page. When Connelly signed the document, he identified himself by his Maine driver's license to the notary who witnessed his signature. That notary was an individual named "Lot Bates." The record does not indicate why Charles arranged to have the Belmont Property transferred to Susan at this time.

[¶9] A "Uniform Residential Loan Application," which purportedly initiated the mortgage loan at issue in this foreclosure matter, was prepared the same day that the quitclaim deed was executed or sometime thereafter. The copy of that loan application in the record that was before the Superior Court, designated "Lubar Exhibit B," is of extremely poor quality, with the typed and handwritten entries heavily shaded and, consequently, it is difficult to read. For example, although the date handwritten on the application appears to be February 27, 2008, it could be the 22nd, 24th, or 27th of January or February of 2008.[4]

---

[4] The month of the date on the application is indicated by a number, either a one or a two.

[¶10] The application purports to be by Connelly, listed as "Borrower," and Charles, listed as "Co-borrower." The first page of the application states that the borrowers seek a loan to purchase, rather than to refinance, the Belmont Property, and states that the Belmont Property will be a "Secondary Residence," contrary to Lubar's assertions as to the purpose of the loan. However, the application also reports, inconsistently, that Connelly already owned the Belmont Property—and that Connelly resided at that location—and lists the Wells Property as other property owned. Lubar's affidavit, filed in support of the motion for summary judgment, describes the Wells Property as a vacation home.[5]

[¶11] There are additional discrepancies in the loan application.[6] The "Borrower," referring to Connelly, is reported as being married; an alternative box for indication of widower status is left blank. The application also lists Connelly's monthly income as $2500, rather than his actual monthly income of approximately $2120. The value of the Belmont Property is listed as $970,000, with a $491,000

---

[5] If the Wells Property was not Connelly's primary residence, foreclosure of that property would be subject to less stringent foreclosure processes. *See* M.R. Civ. P. 93 (subjecting primary residences to more rigorous foreclosure processing requirements).

[6] Although Lubar referenced the loan application and other evidence in certain of his statements of material facts, neither party referred to the concerns we note about these documents. Although "we are generally constrained from searching the record beyond the statements of material fact submitted in support of or opposition to a party's motion for summary judgment," we have stated that we will consider evidence "not identified in statements of material fact when, having become aware of such evidence, it would be an injustice to ignore it." *HSBC Mortg. Servs., Inc. v. Murphy*, 2011 ME 59, ¶ 16 n.9, 19 A.3d 815.

6

mortgage, and the value of the Wells Property is listed as $500,000 with no mortgages or liens. The loan amount sought is $600,000.

[¶12] Only Charles's signature appears on the loan application. Connelly never signed it. The loan application is not notarized. The document indicates that the application was taken by telephone and that the name of the interviewer is "Lot Bates," the same name as the person who had witnessed the January 22, 2008, quitclaim deed transferring the Belmont Property from Connelly to Susan. If the two persons named "Lot Bates" are one and the same, as the record suggests, he or she would or should have been aware that, as of the time of application preparation, Connelly had no ownership interest in the Belmont Property. Bates's name was typed, not signed, on the application. The loan application also indicates that Bates was a representative of "Beechwood Mortgage," a mortgage broker that would later be paid a $12,000 fee as part of the closing on the mortgage loan. The fifth page of the five-page loan application is not in the record.

[¶13] By sworn affidavit, Lubar asserted, "I personally handled the taking of the loan application and the underwriting of the loan made to Frederick W. Connelly, Charles Connelly and Susan Connelly." This sworn statement is contrary to what appears in the record. Nothing in the record, except Lubar's sworn affidavit, indicates that Lubar had any role in preparing the loan application or that he then, or at any other time, had any contact with Connelly.

[¶14]   Lubar's affidavit also asserts that the mortgage transaction was initiated when a mortgage broker named Benjamin Greenblott of Manhattan Financial Services, Inc., not of Beechwood Mortgage, contacted Lubar.  Connelly has averred in no uncertain terms that he never had any contact with Greenblott.[7]

[¶15]   The loan summary purportedly prepared by Greenblott indicates that Connelly was to be the only borrower for the loan on the "Subject Property," the Belmont Property.  Greenblott reported that the Belmont Property had an appraised value of  $970,000, while the requested amount of the loan was to be $600,000.  The reported purpose of the loan was to pay off the existing "$490,000" Homecomings mortgage, pay off some revolving debt, and leave some cash reserves.  The Greenblott loan summary also indicated that the loan would be secured by the Belmont Property and "[i]f necessary a lien may be placed on the Maine property."

[¶16]   As part of the proposed "exit strategy," the loan summary suggested that Connelly could "[s]ell property in Maine."  Notably, despite Lubar's allegation that Greenblott's brokerage action generated the loan, no brokerage fee or other fee was paid to Greenblott or Manhattan Financial Services through the loan closing.

---

[7]  Lubar's statement in his affidavit that Greenblott was acting on behalf of Connelly when he contacted Lubar is inadmissible hearsay.  *See* M.R. Evid. 801(c), 802.

8

[¶17]   On March 31, 2008, at Charles's request, Connelly accompanied Charles and Susan to the loan closing handled by Lubar's attorney, Kristina Yee, at her law office in Massachusetts.  Connelly believed that he was at the closing only to get his name off of the then-existing Homecomings mortgage on the Belmont Property.  Connelly was not represented by counsel.

[¶18]  The loan, as indicated in the promissory note, was for $600,000 with an adjustable rate of 6.25% above the prime rate, but which in no event would ever be below 11.5%.  The terms of the loan required initial monthly payments of $5941.75.  The note was secured by two separate mortgages in favor of Lubar as trustee of the Trust—one given by Susan on the Belmont Property, and one given by Connelly on the Wells Property.

[¶19]  Both mortgages secured payment of the $600,000 loan.  However, one mortgage differed significantly from the other.  Susan's mortgage included a notice, prominently written in bold letters on the first page, stating that (1) the annual percentage rate then applicable was 11.959%; (2) the monthly payment on the note was $5941.75; and (3) the loan was a variable rate loan under which the monthly payment could increase to as much as $9042.51.  Connelly's mortgage included no such notices and disclosures, even though the integrated mortgage and promissory note documents state that the mortgage was secured, in part, by Connelly's purported principal dwelling at the Belmont Property.

[¶20]  Connelly balked at the closing when he began to realize that he was giving a mortgage on his Wells Property to collateralize the loan to refinance the Belmont Property.  Connelly asserts that Lubar's attorney, Yee, assured him that his home was being used to secure only four percent of the value of the note.  While Lubar asserts that Yee gave no such assurance, the significant difference between the $970,000 appraisal on the Belmont Property and the $600,000 amount of the loan could have invited assurances that the risk to the Wells Property was minimal.  At a minimum there are disputes of material fact as to whether such assurances were sought or given.

[¶21]  Relying on Lubar's attorney's assurance about the terms of the loan, Connelly signed and initialed the pages of the loan documents placed before him.  He was given no opportunity before or at closing to review the documents.  Connelly asserts that he would not have signed the documents had he known that his primary residence was being used to secure the full amount of the loan Charles and Susan sought.  Significantly, Charles is a signatory on the note, but Charles is not a party to either mortgage at issue.  The mortgage deed on the Wells Property was recorded in York County.

[¶22]  Connelly was never told of his right to choose a title attorney, he was not informed of his right to rescind the transaction within three days of closing, and he never received copies of the executed loan documents.  The evidence in the

record indicates that all materials generated at the closing were sent to the Belmont Property, so it is unlikely that Connelly would have received them.

[¶23]  Yee asserts that she did not inform Connelly of any right to rescission because his name was no longer on the title to the Belmont Property and because "it was represented that" the Wells Property was not Connelly's primary residence. However, Attorney Yee photocopied Connelly's Maine driver's license at closing and accepted that driver's license to identify Connelly when she notarized the mortgage on the Wells Property.  Connelly never held himself out as a resident of Massachusetts.

[¶24]  Connelly did not receive any proceeds from the loan.  The $51,977.21 loan proceeds remaining after discharge of encumbrances were wired to Susan's bank account four days after the closing in accordance with her instructions.

[¶25]  No payments were made on the note as of November 2008, and Lubar foreclosed on and sold the Belmont Property for $615,000.[8]  That sale was delayed until 2010 by bankruptcy proceedings initiated by Charles and Susan.

_____

[8]  Susan's and Connelly's mortgage documents state that a breach of any condition under the mortgages entitles the Trust to exercise a statutory power of sale under Massachusetts law "or such similar rights provided under the applicable law governing foreclosure of mortgages where the Premises are located . . . ."  The promissory note further states that, to the extent any provision of the transaction is inconsistent with the laws and statutes of Massachusetts and of Maine, that provision is to be adjusted so as to comply with "the maximum interest permitted by applicable law."

The Superior Court in Middlesex County, Massachusetts issued a judgment authorizing foreclosure of the mortgage on and sale of the Belmont Property on September 23, 2009, and the Belmont Property was sold in June 2010.

[¶26] Lubar provided a post-sale accounting claiming a deficiency of almost $230,000 on the note. Notice of Connelly's right to cure was sent to Connelly, and he made no payments. After the parties participated in prelitigation mediation without resolution, Lubar filed a complaint for foreclosure against Connelly on August 22, 2011.[9]

[¶27] Connelly, now represented by counsel, filed an answer and asserted the following affirmative defenses: (1) failure to state a claim upon which relief may be granted; (2) recovery barred by the doctrines of laches, waiver, estoppel, and unclean hands; (3) violations of federal and state predatory lending laws including the Maine Consumer Credit Code, the Improvident Transfers of Title Act,[10] and the Real Estate Settlement Procedures Act,[11] which bar or reduce recovery; (4) failure to mitigate damages; and (5) such other defenses that may apply with further development of the case.

[¶28] The court originally ordered a discovery deadline of May 30, 2012. Lubar moved for summary judgment on his foreclosure complaint on February 17, 2012. The court granted Connelly's unopposed motion to extend the discovery deadline to forty-five days after Lubar's summary judgment motion was resolved,

---

[9] Lubar is the original lender, is in possession of the original note, and is the holder of the note and mortgage. The parties waived participation in the Foreclosure Diversion program. *See* M.R. Civ. P. 93.

[10] *See* 33 M.R.S. §§ 1021-1025 (2013).

[11] *See* 12 U.S.C.A. §§ 2601-2617 (West, Westlaw through P.L. 113-74 (excluding P.L. 113-66, 113-67, and 113-73), approved Jan. 16, 2014).

12

and the summary judgment motion and Connelly's opposition were briefed and argued.

[¶29]   The court entered an order granting Lubar's summary judgment motion on December 31, 2012, making "findings" in a pre-prepared checklist format that did not address Connelly's affirmative defenses.  The court then entered a separate judgment of foreclosure and order of sale as drafted by Lubar's counsel, but with the court adding handwritten notations stating that the decision was entered after written and oral argument and that the court had determined that "the plaintiff [Lubar] is not a 'creditor' *see* 9-A M.R.S. § 1-301(17)."

[¶30]   The court ordered Connelly to pay to Lubar $308,460.54, plus daily interest of $113 accruing after December 19, 2011.   This amount included $8649.75 in "[a]nticipated [a]ttorneys fees and expenses" as of "December 19, 2011."   The court ordered that Lubar may sell the Wells Property to satisfy the judgment if Connelly failed to pay Lubar all amounts due within ninety days of judgment.

[¶31]   The last page of the judgment designates the parties to the action as Connelly, with his last name misspelled "Connelley," and JPMorgan Chase Bank, N.A.  At oral argument, counsel for Lubar stated that use of the JP Morgan name was a drafting mistake, and that Lubar should have been identified as a party.

[¶32] On January 10, 2013, Connelly moved to alter or amend the judgment pursuant to M.R. Civ. P. 59(e) and moved for additional findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(b). The court denied Connelly's motion to alter or amend judgment and dismissed his motion for findings and conclusions. Connelly then brought this appeal.

## II. LEGAL ANALYSIS

A. Summary Judgment Standard

[¶33] We review a summary judgment de novo, applying the rules of summary judgment practice strictly in the residential foreclosure context. *HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶¶ 8-10, 28 A.3d 1158. We review the evidence in the summary judgment record in the light most favorable to the nonprevailing party "to determine whether the record reveals a genuine issue of material fact on any claim." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774. A fact is material "if it has the potential to affect the outcome of the suit." *Deutsche Bank Nat'l Trust Co. v. Raggiani*, 2009 ME 120, ¶ 5, 985 A.2d 1. "When facts, though undisputed, are capable of supporting conflicting yet plausible inferences—inferences that are capable of leading a rational fact-finder to different outcomes in a litigated matter depending on which of them the fact-finder draws—then the choice between those inferences is not for

the court on summary judgment." *Lougee Conservancy*, 2012 ME 103, ¶ 11, 48 A.3d 774.

[¶34] We consider only the portions of the record referred to, and the material facts set forth, in the parties' statements of material facts to determine whether there is no genuine dispute of material fact. *Chase Home Fin. LLC v. Higgins*, 2009 ME 136, ¶ 10, 985 A.2d 508. "Facts not set forth in the statement of material facts are therefore not in the summary judgment record," and we will disregard facts stated in portions of an affidavit or other record evidence, for example, that are not stated, with citation to the record, in the statement of material facts itself. *Id.* ¶ 12 & n.4; *see* M.R. Civ. P. 56(h)(1); *but see HSBC Mortg. Servs., Inc. v. Murphy*, 2011 ME 59, ¶ 16 n.9, 19 A.3d 815.

B.    The Trust's Foreclosure Action

[¶35] Connelly argues that the record contains insufficient evidence or evidence of a quality not admissible at trial to support Lubar's claim for damages. He also argues that, in general, Lubar submitted affidavits and other evidence in support of his motion for summary judgment that so lack indicia of trustworthiness and reliability that they would not be admissible at trial and that they generate genuine disputes of material fact.

[¶36] For a mortgage holder to obtain summary judgment in a residential foreclosure action, its statement of material facts must include certain minimum

facts, supported by references to record evidence of a quality that could be admissible at trial. *Wells Fargo Bank, NA v. deBree*, 2012 ME 34, ¶ 7, 38 A.3d 1257; *Higgins*, 2009 ME 136, ¶ 11, 985 A.2d 508. A party seeking a summary judgment on a complaint for foreclosure is required to set forth the material facts necessary to support his claim, regardless of the adequacy of the opposing party's response. *deBree*, 2012 ME 34, ¶ 9, 38 A.3d 1257; *Gabay*, 2011 ME 101, ¶ 8, 28 A.3d 1158.

[¶37]  Among the facts that a plaintiff in a residential foreclosure action must produce in its properly supported statement of material facts are those showing "the order of priority and any amounts that may be due to other parties in interest, including any public utility easements." *Higgins*, 2009 ME 136, ¶ 11, 985 A.2d 508; *see also* 14 M.R.S. § 6322 (2013) (requiring the court to "determine . . . the order of priority and those amounts, if any, that may be due to other parties that may appear and whether any public utility easements held by a party in interest survive the proceedings"); *Gabay*, 2011 ME 101, ¶ 23, 28 A.3d 1158. Despite Lubar's contention on appeal that he meets this element of a foreclosure action, it is apparent that he has not.

[¶38]  In reviewing the parties' statements of material facts, we have found no statement of material fact with record references showing the order of priority and addressing whether there are any amounts that may be due to other parties in

interest, including public utility easements, as required. *See Gabay*, 2011 ME 101, ¶ 23, 28 A.3d 1158. Thus, viewing the statements of material facts in the light most favorable to Connelly, a genuine dispute of material fact remains in this regard.[12]

[¶39] Additionally, the mortgage holder is required to show the amount due on the mortgage note, including any reasonable attorney fees and court costs, in a statement of material fact supported by record evidence of a quality admissible at trial. *Higgins*, 2009 ME 136, ¶ 11, 985 A.2d 508; *see also* 14 M.R.S. § 6322. Lubar's statement of material facts does address this point, but it states that, "[a]s of January 25, 2012," attorney fees and costs due under the note amounted to $7671.40. However, this statement is not supported by the referenced record citation, which stated a different, higher, amount.

[¶40] Furthermore, the judgment of foreclosure, which Lubar admitted at oral argument was based on the proposed judgment that he submitted to the court, awards $8649.75 in "[a]nticipated Attorneys fees and expenses" accruing as of

---

[12] Lubar appears to be aware that he has not met his obligation on summary judgment as to this element of his foreclosure action. Lubar cited to no statements of material fact whatsoever, much less supporting evidence, in the bare allegation in his memorandum supporting his motion for summary judgment that "[t]here are no parties in interest." In his appellate brief he cites, inexplicably, only to a page of his unverified complaint, the allegations of which Connelly denied. We observe generally that "[a] party's citation to its own complaint is insufficient to support a material fact." *Deutsche Bank Nat'l Trust Co. v. Raggiani*, 2009 ME 120, ¶ 6, 985 A.2d 1. Regardless, even if Lubar did now point to some portion of the record to support this element of his claim, Lubar did not include the necessary facts in his statement of material facts to support his motion, and they are not, therefore, part of the summary judgment record. *See HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶¶ 23-25, 28 A.3d 1158; *Chase Home Fin. LLC v. Higgins*, 2009 ME 136, ¶ 12 & n.4, 985 A.2d 508.

"December 19, 2011." That award of attorney fees is inconsistent on its face with Lubar's statement of material facts both as to the amount and the date on which that amount had accrued. Accordingly, the amount due under the note and mortgage as stated in the judgment is not supported by Lubar's statement of material facts, which in turn was not supported by the record reference.

[¶41] Thus, Lubar has failed to include the minimum required, properly supported, facts in his statement of material facts, and has therefore failed to demonstrate that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law. *See deBree*, 2012 ME 34, ¶ 11, 38 A.3d 1257; *Higgins*, 2009 ME 136, ¶¶ 11, 13, 985 A.2d 508.

[¶42] We do not, therefore, reach Connelly's remaining arguments concerning damages or the specifics of Connelly's argument that Lubar's evidence submitted in support of his statement of material facts is wholly unreliable. We do observe, however, that in numerous instances, the underlying evidence presented by affidavit is contrary to documents appearing in the record or is not of a quality that would be admissible at trial for the purposes for which it is referenced in the statements of material facts. Lubar presents direct averments in his affidavit that do not appear to be based on his personal knowledge, as required by M.R. Civ. P. 56(e). Alternatively, Lubar often phrases averments in his affidavit in a manner that appears to avoid hearsay concerns, such as "I was advised that" or "it was

18

represented to me that," indicating that Lubar is merely reporting that the words were stated to him by another person. However, when these averments in the affidavit are cited in Lubar's statement of material facts, they are sometimes cited as support for the truth of the matter, and thus in a manner that would be inadmissible at trial.[13]

[¶43] Lubar's affidavit also lacks overall trustworthiness. For example, Lubar states that he "personally handled the taking of the loan application" and that he "took a loan application from Frederick and Charles Connelly," but those statements conflict with the loan application that Lubar references in his affidavit, which application states that it was taken by telephone by "Lot Bates" of "Beechwood Mortgage." Finally, Lubar often phrases statements in his affidavit in the passive voice in an apparent attempt to obscure facts.

[¶44] "In the setting of summary judgment practice, any substantial errors or defects in the affidavit itself submitted in conjunction with the moving party's statement of material facts must also be considered to determine trustworthiness." *Murphy*, 2011 ME 59, ¶ 11, 19 A.3d 815. This is consistent with summary

_____

[13] For instance, Lubar's statement of material facts states that "[t]hrough his agent, [Connelly] proposed providing additional collateral for the loan on the Wells Property." This statement is very poorly worded, but for purposes of this example we assume that the statement is meant to convey that Connelly proposed providing his Wells Property as additional collateral for the loan on the Belmont Property. However, the portion of Lubar's affidavit cited in support of this statement is deficient in multiple respects. First, as noted previously, Lubar's averment that the agent, Greenblott, was acting as Connelly's agent is based on hearsay. Second, Lubar's affidavit states only that Lubar "was advised that" Connelly would provide the Wells Property as additional collateral, which does not support the statement of material fact that Connelly in fact proposed providing the Wells Property as collateral.

judgment practice approved by the United States Supreme Court in *Scott v. Harris*, 550 U.S. 372, 379-81 (2007), when the Court held that the trial court could not rely on a version of the facts offered by one party that was "so utterly discredited by the record" that it could not create a dispute of fact.

[¶45] Although a mortgage holder is not required, as Connelly contends, to recite in its statement of material facts that the evidence it relies upon would be admissible at trial, the motion court must be able to discern from the statements of material facts and the record evidence referenced therein that the record evidence could, in fact, be admissible at trial. *See generally Beneficial Me., Inc. v. Carter*, 2011 ME 77, ¶ 10, 25 A.3d 96. The record presented by Lubar in this case presents significant deficiencies in this regard.

[¶46] For the foregoing reasons, we vacate the summary judgment and the judgment of foreclosure.

C. Connelly's Affirmative Defenses

[¶47] Although we could vacate the grant of summary judgment on Lubar's foreclosure complaint solely for the reasons discussed above, *see Raggiani*, 2009 ME 120, ¶ 8, 985 A.2d 1, we briefly address one aspect of Connelly's arguments concerning his affirmative defenses and note that discovery remains to be completed regarding those issues.

[¶48]   Connelly alleged affirmative defenses in his answer to Lubar's complaint for foreclosure.   These include defenses based on Lubar's and the Trust's alleged violations of the Maine Consumer Credit Code, 9-A M.R.S. §§ 1-101 to 12-107,[14] that, Connelly argues, render the mortgage and note unenforceable as to him, void, or subject to rescission.   Specifically, Connelly argues that genuine disputes of material fact exist in four respects concerning defenses he asserts under the Consumer Credit Code: whether (1) the Trust was a "creditor" as defined in 9-A M.R.S. § 1-301(17); (2) the Trust's closing attorney, as the Trust's agent, unlawfully induced Connelly to sign the note and mortgage, citing 9-A M.R.S. §§ 9-401, 9-408 (2013); (3) the Trust failed to provide the required notice of his right to rescind at closing and whether Connelly timely exercised his right to rescind, *see* 9-A M.R.S. § 8-204;[15] and (4) the Trust failed to inform Connelly of his right to choose a title attorney, *see* 9-A M.R.S. §§ 9-101, 9-303 (2013).

[¶49]   Most, though not all, of these alleged defenses hinge on a determination that the Trust was, at the time of the closing, a "creditor" as defined

_____

[14]  Because the closing at issue in this matter occurred on March 31, 2008, the statute in effect at that time applies.

[15]  Title 9-A M.R.S., article 8, was repealed by P.L. 2011, ch. 427, § A-14 (effective Sept. 28, 2011); *see* P.L. 2011, ch. 427, § A-15 (effective Sept. 28, 2011) (enacting the Maine Consumer Credit Code - Truth-in-Lending, codified at 9-A M.R.S. §§ 8-501 to 8-511 (2013)).  Connelly also cites in his brief generally to a section of the federal counterpart to the Maine Consumer Credit Code's truth-in-lending provisions, the Truth in Lending Act, 15 U.S.C.A. § 1635(a) (West, Westlaw through P.L. 113-74 (excluding P.L. 113-66, 113-67, and 113-73), approved Jan. 16, 2014).

in 9-A M.R.S. § 1-301(17). *But see* 9-A M.R.S. §§ 8-103(1-A)(L), 8-204. Connelly thus first argues that the court erred in determining, based on the summary judgment record properly before it, that the Trust is not a "creditor" as defined in section 1-301(17) or in failing to find that a genuine dispute of material fact exists concerning the Trust's status as a "creditor."

[¶50]  To avoid summary judgment on the basis of its affirmative defenses, "the nonmoving party must do more than state its affirmative defense; it must offer admissible evidence in support of that defense" by alleging facts in its statement of material facts sufficient to establish "that the summary judgment record contains disputed issues of fact to generate these defenses." *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 25, 980 A.2d 1270; *Bay View Bank, N.A. v. Highland Golf Mortgagees Realty Trust*, 2002 ME 178, ¶ 11, 814 A.2d 449.

[¶51]  In this case, the court affirmatively determined that the Trust was not a "creditor" as defined in 9-A M.R.S. § 1-301(17). That determination appears to have constituted the primary, if not only, reason for the court's conclusion that Connelly failed to raise a genuine dispute of material fact concerning his affirmative defenses. However, the court's determination is not supported by the record, which instead evidences a genuine dispute of material fact on that issue.

[¶52]  Lubar's statement of material facts asserts that the promissory note that was executed by Connelly, and that was secured by mortgages on the Wells

22

and Belmont Properties, was executed and delivered to the Trust, and the note, on its face, shows that the Trust was the entity to which the debt was initially payable. Lubar's affidavit offered in support of his statement of material facts also asserts that in the normal course of his duties he operates and manages "the lending business of The Clover Trust, which is a mortgage lender licensed by the Massachusetts Division of Banks."

[¶53]   Additionally, to be a creditor as that term is defined in 9-A M.R.S. § 1-301(17), the person or entity must, in relevant part, have "extended credit more than 25 times, or more than 5 times for transactions secured by a dwelling, in the preceding calendar year," or if that numerical standard is not met in the preceding calendar year, in the current calendar year.  Alternatively, "[n]otwithstanding the provisions of this section," a creditor is a person or entity "who originates 2 or more high-rate, high-fee mortgages," which term is defined in 9-A M.R.S. § 8-103, in any twelve-month period *or* "who originates one or more such mortgages through a loan broker," which term is also defined by statute, in any twelve-month period.  9-A M.R.S. §§ 1-301(17), 8-103(1-A)(Q),[16] 10-102(1).[17]

---

[16]   Title 9-A M.R.S. § 1-301(17) (2008) states that "high-rate, high fee mortgage" is defined at 9-A M.R.S. § 8-103(F-1) (2008), but it is apparent that the definition is instead found at 9-A M.R.S. § 8-103(1-A)(Q) (2008), which states that a "'[h]igh-rate, high-fee mortgage' means a residential mortgage loan in which the terms of the loan meet or exceed one or more of the thresholds defined in" 9-A M.R.S. § 8-103(1-A)(FF) (2008).

[17]   Title 9-A M.R.S. § 10-102(1) was amended by P.L. 2009, ch. 248, § 2 (effective Sept. 12, 2009).

[¶54] Lubar and the Trust arguably originated two apparently high-rate, high-fee mortgages in this case. Regardless, the statements of material facts, viewed in a light most favorable to Connelly, establish that the Trust originated at least one residential mortgage loan through loan broker Ben Greenblott or loan broker Beechwood Mortgage in a twelve-month period and that the terms of the loan included an adjustable interest rate of 6.25% *over* the prime rate with a *minimum* interest rate of 11.5%.

[¶55] Although determining whether the two mortgages here are "high-rate, high-fee mortgage[s]" as defined by the Code, and whether Greenblott or Beechwood is a "loan broker," is a fact-intensive process that may require additional facts and analysis, *see* 9-A M.R.S. §§ 1-301(17), 8-103(1-A)(D), (Q), (U), (FF), 10-102(1), Connelly has at least demonstrated a genuine issue of material fact as to whether the Trust was a "creditor" under at least one of the alternative definitions in 9-A M.R.S. § 1-301(17) sufficient to avoid summary judgment in this case.

[¶56] Additionally, viewing the facts in a light most favorable to Connelly—including that Connelly never met Greenblott or Lubar, that he never applied for the loan, that he was induced at closing to enter into the loan based on Lubar's agent's misrepresentations, that the Wells Property was Connelly's primary residence, and that Lubar and his agent(s) knew or should have known that

24

the Wells Property was Connelly's primary residence—the record is rife with genuine disputes of fact material to deciding the issues raised in this case, including Connelly's affirmative defenses. Through discovery, additional facts may come to light to support allegations of fraud or undue influence that Connelly suggested at oral argument may be forthcoming.

[¶57] We therefore vacate the summary judgment for these reasons as well as those discussed in section B above and remand the matter for further development of the facts and issues.[18] We need not and do not address Connelly's additional contentions on appeal concerning his affirmative defenses.

The entry is:

> Judgment vacated and remanded for further proceedings.

---

**On the briefs and at oral argument:**

Susan B. Driscoll, Esq., Bergen & Parkinson, LLC, Saco, for appellant Frederick W. Connelly

John A. Turcotte, Esq., Ainsworth, Thelin & Raftice, P.A., South Portland, for appellee Lewis Lubar, Trustee of The Clover Trust

York County Superior Court docket number RE-2011-177
FOR CLERK REFERENCE ONLY

---

[18] We offer no opinion on the ultimate viability of Connelly's affirmative defenses or whether each provision of the Maine Consumer Credit Code cited by Connelly provides a basis for an affirmative defense. These issues must be resolved on remand after completion of discovery and further proceedings.