MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 50
Docket:        Ken-22-53
Argued:        October 6, 2022
Decided:       July 9, 2024

Panel:         STANFILL, C.J., and HORTON, CONNORS, and LAWRENCE, JJ.*

## STATE OF MAINE et al.

v.

## MOOSEHEAD MOUNTAIN RESORT, INC., et al.

STANFILL, C.J.

[¶1] Moosehead Mountain Resort, Inc., appeals from the Superior Court's (Kennebec County, *Stokes, J.*) grant of summary judgment to the State enforcing restrictive covenants in the Resort's deed that prohibit timber harvesting on, and require the Resort to maintain for public use, a ski area. The Resort argues that the State cannot enforce either covenant because it does not own a parcel that benefits from the covenants. The Resort also argues that the court erred in its interpretation of the public use covenant. Finally, the Resort argues that the court erred in its grant of summary judgment to the State because the public

---

* Although Justice Mead sat at oral argument and participated in the Court's initial conference, he did not participate further in the development of this opinion. Although Justice Jabar sat at oral argument and participated in the Court's initial conference, he retired before this opinion was certified.

use covenant is unreasonable, the State failed to notify the Resort of its alleged breach of the public use covenant, and the State is barred from enforcing the public use covenant by the doctrine of laches. We are unpersuaded by the Resort's arguments and affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶2] The summary judgment record includes the following undisputed facts, which we view in the light most favorable to the Resort, the nonprevailing party. *See Dorsey v. N. Light Health*, 2022 ME 62, ¶ 2, 288 A.3d 386.

[¶3] In 1963, a ski area opened on Big Moose Mountain near Greenville and Moosehead Lake.[1] The ski area opened with four trails and a T-bar lift on the lower half of the mountain. In 1967, the ski area's owners installed a double chairlift to service the upper half of the mountain, increasing the ski area's vertical drop from 600 to 1,600 feet. In 1974, the owners donated the ski area, along with land abutting it and easements benefiting it, to the State.

---

[1] Then known as the Squaw Mountain Ski Resort, the ski area is now generally called Big Moose Mountain. *See History of Squaw Mountain*, Friends of the Mountain Moosehead Lake https://skibigmoose.com/history-of-the-ski-area (last visited July 3, 2024). To be clear, the use of "squaw" is offensive. *See* 1 M.R.S. § 1101(1) (2024).

[¶4]  The State ran the ski area until 1986.  That year, the State sold the ski area, along with the easements and a portion of the abutting parcel, to the Big Squaw Mountain Corporation (BSMC).  The State's purpose in selling the property to a private buyer was to encourage private investment in the maintenance and improvement of the ski area.  Before the sale, BSMC acknowledged the State's desire that the ski area be a viable economic resource in the Moosehead Lake region.  The purchase-and-sale agreement therefore conditioned the conveyance on BSMC replacing the T-Bar with a triple chairlift and completing at least $260,000 of additional repairs and improvements by 1990.

[¶5]  Although the deed did not recite these sale conditions, it did include the following restrictive covenants:

> Timber shall not be harvested from [the ski area] hereby conveyed, except (1) where necessary for trails, lifts, snow-making facilities, construction of transient accommodations and vacation homes for lease or sale, and all related improvements, including roadways, serving the same and the Ski Area and Resort, (2) for firewood or lumber for such resort and improvements, and (3) for the harvest of dead or dying timber or blowdowns.

> This conveyance is conditioned upon the continued public use of the Ski Area highlighted on attached Schedule B, which Ski Area includes only the ski trails and lift lines in existence as of the date hereof and further listed on Schedule C hereof.

4

Schedule B appears to be a copy of a map depicting ski trails on Squaw Mountain Ski Area. Schedule C listed ski lifts and trails on the upper and lower portions of the ski area.[2] Although BSMC originally proposed that these covenants expire after ten years, the deed does not contain any durational language.

[¶6]  The State retained a small parcel on the summit of the mountain. The summit parcel includes a fire tower, and the State indicated that it would limit its use of the summit parcel to the fire tower, radio transmission, helicopter landings to service the tower, and a hiking trail.

---

[2]  Specifically, Schedule C listed the following ski lifts and trails:

A.  St. John
B.  Allagash
C.  3000' T-Bar
D.  Kennebec
E.  Squaw Brook
F.  2000' T-Bar
G.  Fitzgerald (Upper)
H.  Fitzgerald (Lower)
I.  East Branch of Penobscot
J.  Penobscot
K.  Moose River
L.  Piscataquis
M.  St. Croix
N.  6000' Double Chair Lift
0.  Seboomook
P.  Canada Falls - 4 acres
Q.  Pony Lift

[¶7]  The State also granted BSMC the option to purchase the rest of the abutting land without any restrictions on use.  BSMC exercised that option in 1988.

[¶8]  In 1990, BSMC filed for bankruptcy and a creditor foreclosed on the ski area, the abutting land, and the benefiting easements.  The creditor conveyed the property to a trust, and in 1995 the trust conveyed the property to the Resort.  The deed from the creditor to the trust and the deed from the trust to the Resort include the same timber harvesting and public use covenants contained in the deed from the State to BSMC.

[¶9]  Prior to purchasing the ski area, the Resort retained an attorney who informed the Resort of the restrictive covenants in the chain of title.  The Resort's owner, who works in the real estate industry, did not attempt to remove the restrictive covenants before the sale.

[¶10]  The Resort operated the ski area without incident for almost a decade.  It spent about $1.8 million on the ski area from 1995 to 2004, but never made a profit.  Around 2004 or 2005, the Resort closed the double chairlift servicing the top half of the ski area after that lift malfunctioned and injured four people.  The Resort has not reopened the lift.

6

[¶11]  The ski area was closed from 2009 to 2012.  During that time, the Resort hired a logging company to harvest timber on the abutting land.  Although the Resort's deed prohibited timber harvesting on the ski area except to cut trails and for other limited purposes, the logging company harvested about 170 acres of timber from the ski area.  Some—but not all—of this harvesting was done to cut new trails.

[¶12]  In 2013, the Friends of the Mountain, a nonprofit organization, began operating the lower half of the ski area on a limited basis.  In the years that followed, the Friends spent about $530,000 running the ski area.  By all accounts, the lower half of the ski area has improved significantly under the Friends' stewardship.

[¶13]  The upper half of the ski area, however, has deteriorated.  The Resort obtained an estimate that repairing the damaged lift would cost $1 million.  The Resort spent about $350,000 on repairs, but ultimately determined that the lift had to be replaced.  The Resort estimates that fully replacing the lift will cost about $2 million to $2.5 million.

## B. Procedural History

[¶14] In August 2016, the State filed a complaint in the Superior Court seeking to enforce the timber harvesting and public use covenants.[3] The State sought declaratory relief, equitable relief, and damages.

[¶15] The Resort moved for summary judgment and judgment on the pleadings. *See* M.R. Civ. P. 12(c), 56(b). The court denied the Resort's motion in part, identifying several unresolved factual issues. After further discovery, the State moved for summary judgment. *See* M.R. Civ. P. 56(a). According to the State, the undisputed facts establish that the State could enforce the covenants against the Resort and that the Resort violated the covenants. The court agreed and granted summary judgment to the State, concluding that the Resort breached both covenants. With respect to the timber harvesting restriction, the court ordered the Resort to pay damages of $136,277.64 to the State, which was the estimated mill value of the timber harvested from the ski area.

[¶16] The court held an evidentiary hearing to determine damages for breach of the public use covenant. Following the hearing, the court directed the

---

[3] The State also alleged that the Resort conducted unlicensed timber harvesting, *see* 12 M.R.S. § 685-B(1)(C) (2010), breached a contract with the State, and unjustly enriched itself by encumbering the subject property with mortgages. Those claims are not at issue on appeal.

Resort to place $3,831,000 into an escrow account to replace the lift servicing the top half of the ski area and two smaller lifts, and to bring the trails on the top half of the ski area back to their pre-2004 condition. The Resort timely appealed. *See* M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶17] On appeal, the Resort does not challenge the amount or calculation of the court's damages award. Instead, the Resort focuses on whether the State was entitled to enforcement and any damages at all. We explain below why we disagree with each of the Resort's arguments.

### A. Standard of Review

[¶18] "We review the evidence in the summary judgment record in the light most favorable to [the Resort] to determine, de novo, whether there is any genuine dispute of material fact and whether the [State is] entitled to a judgment as a matter of law." *Janusz v. Bacon*, 2022 ME 57, ¶ 7, 285 A.3d 288; *see* M.R. Civ. P. 56(c). As the plaintiff and moving party, the State has the burden "to demonstrate that each element of its claim is established without dispute as to material fact within the summary judgment record." *Cach, LLC v. Kulas*, 2011 ME 70, ¶ 8, 21 A.3d 1015 (quotation marks omitted).

**B.      Necessity of a Benefiting Parcel**

[¶19]  The Resort argues that the State does not have standing to enforce the covenants because it does not own or use a parcel of land benefited by those covenants (a "benefiting parcel").[4]  The State argues that the covenants are enforceable even without a benefiting parcel.  We agree with the State.

[¶20]   The Resort relies on a common law rule preventing the enforcement of a covenant against subsequent landowners by anyone who did not own land benefited by that covenant.  *See Toothaker v. Pleasant*, 288 S.W. 38, 42-43 (Mo. 1926); Restatement of Prop. § 537 (Am. L. Inst. 1944); *Blasser v. Cass*, 314 S.W.2d 807, 809 (Tex. 1958).  In the language of property law, a person could enforce against subsequent property owners a covenant "appurtenant" to their land, but not a covenant "in gross."  *See* Restatement (Third) of Prop.: Servitudes § 1.5(1)-(2) (Am. L. Inst. 2000);[5] *Stickney v. City of*

---

[4] The Resort also argues that our "stranger to the deed" doctrine prevents the State from enforcing the covenants because the general public benefits from those covenants.  The stranger-to-the-deed doctrine provides that "a reservation to a stranger, meaning an individual who is not a party to the transaction, cannot by its own force pass rights to the stranger." *Midcoast Cohousing Land Acquisition, LLC v. Riverhouse Tr.*, 2008 ME 70, ¶ 8, 946 A.2d 421.  Here, however, the State is enforcing the covenants on its own behalf, which it may do notwithstanding the public's "right to use the servitude benefit."  Restatement (Third) of Prop.: Servitudes § 2.18 (Am. L. Inst. 2000).  The State is not a stranger to the deed.

[5] "'Appurtenant' means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land. . . . 'In gross' means that the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land."  Restatement (Third) of Prop.: Servitudes § 1.5 (1)-(2).

10

*Saco*, 2001 ME 69, ¶¶ 31-32, 770 A.2d 592 (discussing the difference between easements "appurtenant" and "in gross").

[¶21] Some jurisdictions have moved away from this common law rule in favor of the more flexible approach endorsed by the Third Restatement, which provides, "Ownership of land intended to benefit from enforcement of [a covenant] is not a prerequisite to enforcement, but a person who holds the benefit of a covenant in gross must establish a legitimate interest in enforcing the covenant." Restatement (Third) of Prop.: Servitudes § 8.1; *see, e.g.*, *Lynch v. Town of Pelham*, 104 A.3d 1047, 1055-56 (N.H. 2014). We have cited the Third Restatement favorably *see, e.g.*, *Matteson v. Batchelder*, 2011 ME 134, ¶ 14, 32 A.3d 1059; *Mabee v. Nordic Aquafarms, Inc.*, 2023 ME 15, ¶¶ 53-58, 290 A.3d 79; and have recognized that certain servitudes[6] in gross, other than covenants in gross, are enforceable, *see Stickney*, 2001 ME 69, ¶¶ 31-32, 770 A.2d 592 (easements in gross); *Beckwith v. Rossi*, 157 Me. 532, 534, 175 A.2d 732, 734 (1961) (profits a prendre). Nonetheless, the enforceability of covenants in gross remains an issue of first impression in Maine. *See Andersen v. Bangor*

---

[6] "Servitude" is a broad term that encompasses all nonpossessory encumbrances on land, including "easements, irrevocable licenses, profits, and real covenants." *Servitude*, Black's Law Dictionary (11th ed. 2019); *see Mabee v. Nordic Aquafarms Inc.*, 2023 ME 15, ¶ 54, 290 A.3d 79 (defining "servitude" generally as a legal device creating a right or obligation that runs with the land).

*Hydro-Elec. Co.*, No. CV-09-071, 2012 WL 10467424, at *2 n.2 (Me. Super. Sep. 21, 2012).

[¶22]  We understand that there are factors weighing against covenants in gross.  *See Waikiki Malia Hotel, Inc. v. Kinkai Props. Ltd. P'ship*, 862 P.2d 1048, 1059 (Haw. 1993).  First, a covenant in gross limits the value of one parcel of land without an offsetting increase in the value of other land.  *See* Restatement of Prop. § 537 cmt. a ("There is a social interest in the utilization of land.  That social interest is adversely affected by burdens placed on the ownership of land . . . . Unless a burden has some compensating advantage which prevents it from being on the whole a deterrent to land use and development, the running of the promise by which it was created is not permitted."); Thomas E. Roberts, *Promises Respecting Land Use—Can Benefits Be Held in Gross?*, 51 Mo. L. Rev. 933, 944 (1986) ("Before one can depress the value of land conveyed there must be an offsetting benefit.  Requiring a dominant estate provides this benefit as at least some land may increase in value.").  Second, a covenant in gross can extend the disfavored power of the "dead hand" by limiting the use of property in perpetuity.  *See* Gerald Korngold, *Privately Held Conservation Servitudes: A Policy Analysis in the Context of in Gross Real Covenants and Easements*, 63 Tex. L. Rev. 433, 457 (1984).  Finally, the owner of land burdened

by a covenant in gross may have difficulty locating the beneficiary.  *See* Roberts at 945; *Waikiki Malia Hotel*, 862 P.2d at 1059.

[¶23]  These concerns fade, however, when the State holds a covenant in gross.  The State can enforce the benefit of a covenant in gross on behalf of the public, and its interest in the public benefit remains over time.  *See* Richard R. Powell, 9 Powell on Real Property § 60.04[3][a] at 60-47 to -48 (Michael A. Wolf ed. 2000).  Moreover, unlike a private party, the State is not difficult to locate. *See Middlefield v. Church Mills Knitting Co.*, 35 N.E. 780, 782 (Mass. 1894) (recognizing a benefit in gross held by a municipality in part because the municipality was "immortal[] and locally fixed").  For these reasons, the Third Restatement favors allowing governments to "enforce servitudes imposed for their benefit even though they own no specific land to be benefited by performance of the covenant."  Restatement (Third) of Prop.: Servitudes § 2.6 Reporter's Note.

[¶24]  Thus, whatever our reservations may be in allowing private parties to hold covenants in gross, we do not see a good reason to prohibit the State from doing so.  The State may enforce a restrictive covenant without demonstrating that it owns a benefiting parcel if that is consistent with the original covenanting parties' intent.  *See Mabee*, 2023 ME 15, ¶ 54, 290 A.3d 79

("[A] servitude should be construed in a manner that carries out the purpose for which it was created."). The State was the intended beneficiary of the covenants at issue here. Although neither the deed nor the circumstances surrounding its creation indicate that the covenants were intended to benefit the State's ownership or use of a benefiting parcel, the State has a sufficiently cognizable interest to enforce those covenants.[7]

## C.   Construction of the Public Use Covenant

[¶25] The Resort argues that the deed only requires that the ski area be held open for "public use," and does not specifically require the Resort to keep the top half of the ski area open.[8]   Relatedly, the Resort argues that any ambiguity should be resolved in favor of the free use of property and against

---

[7] The Superior Court also held that "if the State is required to have an abutting, benefitted parcel in order to enforce the deed restrictions, it does in fact own such a parcel, namely the Summit Parcel." Nothing in the summary judgment record indicates that the State created the covenants at issue here to benefit its ownership or occupancy of the summit parcel.  Rather, the State created the public use and timber harvesting restrictions to benefit the general public by allowing for outdoor recreation opportunities.  Because we hold that the State is not required to have a benefiting parcel, we need not address this conclusion further.

[8] We do not construe the Resort's argument on this point as a challenge to the relief ordered by the Superior Court.  The Resort does not argue, for example, that the evidence at the damages hearing was insufficient to support the court's damages award. *Cf. Brown v. Compass Harbor Vill. Condo. Ass'n*, 2020 ME 44, ¶¶ 19-26, 229 A.3d 158 (reviewing the sufficiency of evidence supporting court's award of damages for breach of contract).  Because we were not asked to do so by the parties, we do not address the propriety of the specific relief ordered by the court. *See Holland v. Sebunya*, 2000 ME 160, ¶ 9 n.6, 759 A.2d 205 ("The failure to mention an issue in the brief or at argument is construed as either an abandonment or a failure to preserve that issue.").

the State. The State counters that the Superior Court properly interpreted the deed language. Again, we agree with the State.

[¶26] We recently explained how we interpret restrictive covenants:

The interpretation of a deed containing a restrictive covenant presents a question of law that we consider de novo. The cardinal rule in the interpretation and construction of deeds, as in the case of any contract, is to seek to ascertain the intention of the parties. In determining the intent of the parties to the deed, we look at the instrument as a whole.

In construing language within a deed, we first give words their plain and ordinary meaning to determine if they create any ambiguity. The ordinary or plain meaning of a term within a restrictive covenant is determined by its dictionary definition if the covenant itself does not define the term. If the language of a deed is unambiguous, it will guide interpretation of the parties' intent. If language in a deed is ambiguous, meaning that it is susceptible of multiple interpretations and the intention of the parties to the deed is in doubt, then extrinsic evidence may be introduced to determine the parties' or grantor's intent.

*Morgan v. Townsend*, 2023 ME 62, ¶¶ 17-18, 302 A.3d 30 (alterations, quotation marks, and citations omitted).

[¶27] If extrinsic evidence does not clear up an ambiguity, we apply the rules of construction of deeds. *Id.* ¶ 18. Those rules direct us to give effect to the parties' intent without violating public policy and, "[a]mong reasonable interpretations," prefer "that which is more consonant with public policy." Restatement (Third) of Prop.: Servitudes § 4.1; *see Morgan*, 2023 ME 62, ¶ 18, 302 A.3d 30. Public policy favors "the free use of property," *Morgan*, 2023 ME

62, ¶ 18, 302 A.3d 30 (quotation marks omitted), so we typically interpret ambiguous deed restrictions narrowly and against the grantor, *Beckerman v. Conant*, 2017 ME 142, ¶ 17, 166 A.3d 1006.  However, that rule "does not apply when the grant is from the sovereign and is not purely a commercial transaction."  *Cushing v. State*, 434 A.2d 486, 500 (Me. 1981).  To the contrary, such grants are construed favorably to the sovereign and, by extension, to the public.  *See id.*

[¶28]  The public use covenant at issue here provides,

This conveyance is conditioned upon the continued public use of the Ski Area highlighted on attached Schedule B, which Ski Area includes only the ski trails and lift lines in existence as of the date hereof and further listed on Schedule C hereof.

[¶29]  The Resort's 1995 deed does not define the term "public use," but the 1986 release deed from the State to BSMC—which is in the Resort's chain of title—does define "public purposes."  The release deed states that the conveyance is made in accordance with a Financial Order which determined that the conveyance was to be done "exclusively for public purposes."[9]  The release deed explains,

---

[9]  Because the deed specifically references the Financial Order, we may consider it without concluding that the deed language is ambiguous.  *See Gravison v. Fisher*, 2016 ME 35, ¶ 38, 134 A.3d 857 (reviewing a referenced subdivision plan to interpret the language of the deed) *abrogated on other grounds by Dupuis v. Ellingwood*, 2017 ME 132, ¶ 9 n.4, 166 A.3d 112; *see also 328 Owners Corp. v. 330 W. 86 Oaks Corp.*, 865 N.E.2d 1228, 1234 (N.Y. 2007) (concluding that because the deed "derives

16

> Without limiting the definition of "public purposes," it is expressly understood that "public purposes" shall include the maintenance, expansion, and operation of the Ski Area and Resort on the premises hereby conveyed . . . .

Thus, the release deed makes clear the parties' intent that BSMC and its successors maintain, operate, and even expand the ski area.

[¶30]    Next, we note that "public use" is modified by the word "continued," indicating that the type of public use required is the same public use that existed prior to BSMC's purchase of the ski area. *See Continue*, New Oxford American Dictionary (3d ed. 2010) (defining "continued," when used with an object, as "carry[ing] on with (something one has begun)"); *see also Continue*, Webster's New College Dictionary (5th ed. 2016) (defining "continue" as, inter alia, "to go on in a specified course of action or condition; persist" and further explaining that "continue . . . stresses uninterrupted existence rather than duration" (emphasis omitted)).  In other words, the deeds required that the public use provided for when the State owned the ski area continue.

[¶31]  Finally, the deeds state that they are conditioned on the continued public use of "the Ski Area."  According to the deeds, "the Ski Area" includes specifically the trails and lifts listed in Schedule C appended to the deeds.  As a

all its validity" from a referenced statute, the statute's "provisions must be construed into and with the deed" (quotation marks omitted)).

result, we read the deed language to reserve a right in the public to use the trails and lifts itemized in the deeds in the manner that they had been used prior to BSMC's ownership, for skiing and similar recreational activities. The permanent closure of a ski lift or trail is inconsistent with the existence of this right. The covenants therefore impose at least some obligation on the Resort to maintain and operate the trails and lifts listed in Schedule C.

[¶32] Because the deed language does not clearly define the scope of that obligation, we look to extrinsic evidence of the parties' intent to resolve that ambiguity. *See Morgan*, 2023 ME 62, ¶ 18, 302 A.3d 30. The record here indicates that the parties intended for BSMC and its successors to make reasonable efforts and investments to keep the whole ski area open for skiing. It is undisputed that the State sought a private buyer for the ski area as a strategy to encourage private investment in the maintenance and improvement of the ski area. It is also undisputed that, before the sale, BSMC acknowledged the State's desire for the ski area to be a viable economic resource in the Moosehead Lake region. Additionally, in the purchase and sale agreement the State required BSMC to make specific repairs and improvements to the ski area. Although those specific requirements were not recited in the release deed, they are relevant evidence of the types of maintenance and improvement

obligations the parties envisioned when they agreed to the more general public use covenant that does appear in the deed.

[¶33]  Like the repairs and improvements contemplated by the original covenanting parties in 1986, an operating lift servicing the upper half of the ski area is necessary to keep the whole ski area open for public use today. Moreover, such a lift was specifically listed in Schedule C, which was attached to and incorporated in the deed.  While the Resort initially attempted to repair or replace the double chairlift servicing the top half of the ski area, it abandoned those efforts.  The entire upper half of the ski area has been closed for two decades and has fallen into disrepair.  We agree with the Superior Court that, by closing half of the ski area indefinitely, with no plan to reopen, the Resort fell short of its obligation to provide for "continued public use of the Ski Area."

## D.    Enforceability in Equity of the Public Use Covenant

[¶34]  Finally, the Resort argues that, if the public use covenant requires it to repair and reopen the top half of the ski area, that requirement is unenforceable in equity because (1) it is unreasonable, (2) the State did not notify the Resort that it had an affirmative obligation to make repairs, and (3) the State is barred by the doctrine of laches from enforcing the public use requirement.  The State argues that the public use requirement is reasonable,

the Resort had notice of its requirements, and laches is inapplicable here. Once again, we agree with the State.

## 1. Reasonableness

[¶35] "A restrictive covenant will be enforced in equity only if it is reasonable under the circumstances." *Green v. Lawrence*, 2005 ME 90, ¶ 11, 877 A.2d 1079. Reasonableness is a low bar; "use restrictions on property are valid so long as there is some rational justification for the restriction." *Mabee*, 2023 ME 15, ¶ 55, 290 A.3d 79 (alteration and quotation marks omitted).

[¶36] The Resort argues that the public use covenant is unreasonable because it requires the Resort to invest millions of dollars into a ski area that has never been profitable. We construe this as an argument that the public use covenant "imposes an unreasonable restraint on alienation." Restatement (Third) of Prop.: Servitudes § 3.1(3); *see id.* §§ 3.4-3.5.

[¶37] A restrictive covenant may directly impose an unreasonable restraint on alienation if the covenant explicitly limits the conditions under which the burdened property may be sold. *See Low v. Spellman*, 629 A.2d 57, 58-59 (Me. 1993); Restatement (Third) of Prop.: Servitudes § 3.4 & cmt. b. The public use covenant here does not limit the conditions under which the property may be sold; the Resort is free to sell the ski area whenever it chooses

to whomever it chooses. It need not ask the State or anyone else for permission to do so, and it may transfer its entire interest, or any portion thereof. The public use covenant therefore does not directly impose an unreasonable restraint on alienation.

[¶38] A restrictive covenant may also indirectly impose an unreasonable restraint on alienation if it "lacks a rational justification." Restatement (Third) of Prop.: Servitudes § 3.5(2); *see Mabee*, 2023 ME 15, ¶ 55, 290 A.3d 79. A restrictive covenant is not rendered unreasonable, however, merely "by limiting the use that can be made of property, by reducing the amount realizable by the owner on sale or other transfer of the property, or by otherwise reducing the value of the property." Restatement (Third) of Prop.: Servitudes § 3.5(1). Nor is a restrictive covenant rendered unreasonable merely because it requires "ongoing affirmative activity on the part of the promisors," including ongoing maintenance. *Day v. McEwen*, 385 A.2d 790, 793 (Me. 1978).

[¶39] We therefore do not agree with the Resort that the public use covenant constitutes an indirect unreasonable restraint on alienation. That restriction is sufficiently justified by the State's interest in fostering economic development and outdoor recreation in the Moosehead Lake region. The

Resort is a sophisticated business entity that purchased the ski area, subject to the public use covenant, in an arm's-length transaction. It cannot escape on the grounds of unreasonableness the obligations that it voluntarily incurred.

## 2. Notice

[¶40] A restrictive covenant cannot be enforced in equity against a subsequent landowner who lacks notice of the covenant. *See Wykeham Rise, LLC v. Federer*, 52 A.3d 702, 715 (Conn. 2012). The Resort argues that it is therefore entitled to notice of the State's specific interpretation of the public use covenant. We disagree; the notice requirement was met here because the covenants were contained in the Resort's chain of title and in the deed to the Resort.[10] No more is required.

## 3. Laches

[¶41] "Laches is negligence or omission seasonably to assert a right. It exists when the omission to assert the right has continued for an unreasonable and unexplained lapse of time, and under circumstances where the delay has been prejudicial to an adverse party, and where it would be inequitable to enforce the right." *Brochu v. McLeod*, 2016 ME 146, ¶ 13, 148 A.3d 1220 (quotation marks omitted). The Resort notes that the lift servicing the top half

---

[10] Moreover, before the sale, the Resort's attorney specifically told the Resort that the covenants were contained in the chain of title.

of the ski area stopped operating in 2004, and that prior owners of the ski area arguably also violated the public use requirement, but the State did not seek to enforce that covenant against the Resort until 2016. Therefore, according to the Resort, the State is barred by the doctrine of laches from enforcing the public use covenant, or there is at least a genuine issue of material fact on that point.

[¶42] To avoid summary judgment on the basis of an affirmative defense such as laches, the non-moving party must offer "admissible evidence in support of that defense by alleging facts . . . sufficient to establish that the summary judgment record contains disputed issues of fact to generate [the] defense[]." *Lubar v. Connelly*, 2014 ME 17, ¶ 50, 86 A.3d 642 (quotation marks omitted); *see also Quirk v. Quirk*, 2020 ME 132, ¶ 11, 241 A.3d 851 (describing laches as an affirmative defense). Although the summary judgment record raises a question about the State's delay in enforcement, it does not include any evidence suggesting that the delay was unreasonable or resulted in any prejudice to the Resort. Thus, the Resort did not generate a genuine issue as to a laches defense.

### III. CONCLUSION

[¶43]  The State's conveyance of the land on Big Moose Mountain to the Resort's predecessor-in-interest was done for public purposes, including the operation and maintenance of the existing ski area.  The deed's restrictive covenants required the continued public use of the ski area and limited the grantee's right to harvest timber.  Those restrictive covenants are enforceable by the State on behalf of the public without regard to the existence of a benefiting parcel of land.

The entry is:

Judgment affirmed.

---

Elliott R. Teel, Esq., Teel Law Office, Portland, and Jonathan M. Flagg, Esq. (orally), Flagg Law, PLLC, Portsmouth, New Hampshire, for appellant Moosehead Mountain Resort, Inc.

Aaron M. Frey, Attorney General, and Lauren E. Parker, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellees State of Maine et al.

Kennebec County Superior Court docket number CV-2016-147
FOR CLERK REFERENCE ONLY