DAVID L. SINFORD *vs.* RALPH L. WATTS.

Washington. Opinion November 23, 1923.

*A deed admittedly conveying title to upland construed not to include the flats between high and low-water mark.*

Under the Colonial Ordinance of 1641-7 the owner of upland adjoining tide-water, prima facie owns to low-water mark, not exceeding 100 rods and subject to public rights of passage by boat; the flats are his unless the presumption is rebutted by proof to the contrary.

The "shore" is the strip of land lying between high and low-water mark. It is a band with two margins, an inner or landward margin corresponding with high-water mark and an outer or seaward margin corresponding with low-water mark. Whether the one margin or the other is meant depends upon all the calls in the deed and the particular circumstances and conditions of the case.

In the instant case the starting point, "Commencing on the shore" standing alone does not define itself, but as that starting point is fixed at 174 rods from the northeast corner of the Watts lot marked by a stake, and the measurement shows that from that northeast corner back to the high bank above the high-water mark is 171.3 rods and the high-water mark is estimated at twenty-five feet beyond that, while the mean low-water mark is 165 feet beyond that bluff, it is evident that the expression "Commencing on the shore" means the high-water and not the low-water mark.

The other calls in the deed substantiate this construction and lead to the conclusion that taken as a whole the deed does not include the flats.

On report. An action of debt to recover the penalty for the erection and maintenance of a fish weir in tide-waters in front of what plaintiff claims to be his shore or flats, without his consent, in violation of the provisions of Chap. 4, Sec. 125 of the R. S. The evidence was taken out before the presiding Justice without a jury, and then by agreement of the parties the case was reported to the Law Court to render such final judgment therein as the law and the evidence required. Judgment for defendant.

The case is stated in full in the opinion.

*Gray & Sawyer and John F. Lynch,* for plaintiff.

*O. H. Dunbar,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

CORNISH, C. J.   R. S., Chap. 4, Sec. 125, provides that no fish weir shall be erected or maintained in tide-waters below low-water mark in front of the shore or flats of another without the owner's consent under a penalty to be recovered in an action of debt by the owner of the shore or flat.   This action was brought under that provision.   The plaintiff is admittedly the owner of the upland and the issue is narrowed to this, is he also the owner of the flats adjoining the upland?

The answer to this question depends upon the construction of the deeds under which the plaintiff acquired title.   Both parties claim title, the plaintiff to both upland and flats and the defendant to flats alone, from a common source, John Holway and Rufus K. Porter, who conveyed to Daniel Watts and George E. Watts in the year 1855.   Many conveyances among members of the Watts family followed between the years 1855 and 1887, during which time the property was conveyed as an entirety the flats with the upland. On November 19, 1887, the defendant claims that a separation took place, the then owners of both upland and flats, H. L. Watts, George E. Watts and Rebecca E. Sanborn conveying to Lydia B. Gower the upland by a deed the terms of which are the same as those of the plaintiff's deed and thereby they necessarily retained in themselves the title to the flats.   The Lydia B. Gower title has come down by mesne conveyances to the plaintiff, and the title to the flats, if not embraced in the Gower deed, was conveyed to the defendant in 1919 by the Watts heirs.

The plaintiff obtained title on April 17, 1915, from E. Payson Grimes.   This deed specifies no boundaries but refers to and impliedly incorporates the description of the Gower lot conveyed by Frederick A. Gower and others to Grimes on February 26, 1908.   The latter is therefore the important deed and the description is in these words: "A certain lot or parcel situated in Roque Bluffs, formerly Jonesboro . . . . bounded as follows:   Commencing on the shore at the eastern line of land now or formerly of George and Jonah Watts, running by said line north 22 degrees west 174 rods; thence by the eastern line of land now or formerly known as Lot No. 6, 134 rods; thence running easterly by Varney's line now or formerly so-called,

1.05 rods; thence running south 10 degrees east to the shore; thence by the shore to the first mentioned bound; being the land now or formerly known as 'Seal Cove lot'."

In determining the construction of this deed, conveying property upon the seashore, certain general principles well defined and firmly settled in this State must be observed, and their binding force must be recognized so far as they are applicable. Under the Colonial Ordinance of 1641-7, the owner of upland adjoining tide-water prima facie owns to low-water mark (not exceeding 100 rods and subject to public rights of passage by boat). The flats are his unless the presumption is rebutted by proof to the contrary. Of course the owner of both may convey both, or he may convey either without the other. The question in a given case is what has he done. The shore is the strip of land lying between high-water mark and low-water mark. It is a band with two margins, an inner or landward margin corresponding with high-water mark and an outer or seaward margin corresponding with low-water mark. Whether in a given deed the one margin or the other marks the boundary depends upon all the calls in the deed and the particular circumstances and conditions of the case.

Let us examine and construe the provisions of the deed under consideration in the light of these general principles and of previous decisions of this court.

The first important question to be determined is the starting point of the boundary line. Is it at the outer or the inner margin of the shore? The first call is: "Commencing on the shore at the eastern line of land owned by George and Jonah Watts." This Watts land is Lot No. 5, and bounds the Seal Cove lot or the Gower lot on the west. It is admitted that the Watts lot runs to low-water mark. At what point then on the eastern line of the Watts lot shall the western boundary of the Gower lot under this deed begin? The description says, "on the shore at the eastern line." It does not say whether on the seaward margin of the shore, that is, low-water mark, or the landward margin, that is, high-water mark. If it said "Beginning at the sea at the eastern line" &c. it might be held that low-water was intended under the authority of *Snow* v. *Mt. Desert Island R. E. Co.*, 84 Maine, 14. If on the other hand the description began at a known monument on the upland and ran given courses and distances around to the shore and thence by the shore, the

shore itself would be excluded and the line would run only to high-water mark, under the authority of *Montgomery* v. *Reed*, 69 Maine, 510.

The words, "Commencing on the shore" standing alone, do not define themselves, therefore we must go to the topography of the land and other calls in the deed for interpretative aid.

From the surveyor's testimony and notes it appears that on the line between Watts and Sinford the height of land stops at a bank near high water. The surveyor testified on direct examination, "There is a high bank there. We went down over the bank and projected this line across the flats one hundred and sixty-five feet. . . . . The height of land stopped at the bank at high water and then the flats below the bank was one hundred and sixty-five feet to what we would call medium low water." On cross-examination he explained the location further: "On the western side of the lot it is fairly good growth, on a high bank thirty or forty feet from low water. The bank is very abrupt so that the high water makes up within twenty or twenty-five feet of being perpendicular from the bank to the upland, and that is wood land."

This high bluff would make a natural point of beginning, and when we consider the first call in the deed it leaves little doubt that that was the point intended. The call is: "running by said line" (that is the easterly line of land owned by George and Jonah Watts) "north 22 W, 174 rods." This first call runs along the easterly line of the Watts lot or lot 5, a distance of 174 rods, to its northeast corner, which is also the southeast corner of lot 6 lying northerly of lot 5, thence it runs 134 rods along the easterly line of lot 6.

This means that the starting point is 174 rods according to the deed, from the southeast corner of lot 6, to which the first measurement runs. That southeast corner is marked, according to the surveyor's notes, by a stake, and measuring back from that stake the distance to the bluff above the high-water mark is 171.3 rods, the high-water mark slightly beyond that, estimated at twenty or twenty-five feet, while the mean low-water mark is 165 feet beyond that or a distance of ten rods. It is evident from these measurements that the inland side of the shore was taken as the starting point and the first call carried the line 174 rods, or about that distance, as the mean high-water mark might be a matter of some uncertainty and therefore of judgment on the part of the surveyor,

to the northeast corner of the Watts lot. This fastens the starting point with nearly as great certainty as though it were marked by a spruce tree standing on the bank, as in *Whitmore* v. *Brown*, 100 Maine, 410.

. This view is strengthened by the other calls in the deed. The boundary line continues northerly "by easterly line of lot 6, 134 rods, thence easterly by Varney's line 105 rods, thence south 10 degrees east to the shore." To which margin of the shore? Obviously to the high-water margin. The preposition "to" when used in this connection is a . word of . exclusion. *Bradley* v. *Rice*, 13 Maine, 198; *Bonney* v. *Morrill*, 52 Maine, 256; *Montgomery* v. *Reed*, 69 Maine, 510. The line stops when it reaches the shore and does not continue across the shore any more than if it ran to land of another owner. The final call: "thence by the shore to the first mentioned bound" further emphasizes the correctness of this construction and carries the line from the inland side of the shore where the easterly line stopped, along said inland side to the point of beginning.

Studying all the calls together in connection with the location of the lot, the court is of opinion that this description falls within a line of decisions under somewhat similar calls and circumstances, such as *Montgomery* v. *Reed*, 69 Maine, 510; *Brown* v. *Heard*, 85 Maine, 294; *Freeman* v. *Leighton*, 90 Maine, 541; *Proctor* v. *Maine Central R. R. Co.*, 96 Maine, 458; *Whitmore* v. *Brown*, 100 Maine, 410, and *McLellan* v. *McFadden*, 114 Maine, 242.

It does not come within the rule in *Snow* v. *Mount Desert Island R. E. Co.*, 84 Maine, 14, and in *Dunton* v. *Parker*, 97 Maine, 461, strenuously relied on by the plaintiff, where it was held that where both the termini of a boundary by the shore are at its outer margin the shore should be included. Here both termini are at the inner margin and the shore should be excluded.

The plaintiff urges further the force of the clause at the end: "Meaning to convey lot known as the Seal Cove lot." Such a clause following a particular description by metes and bounds, unless the contrary appears, does not enlarge the grant but ordinarily is intended as a help to trace the title. *Brunswick Sav. Inst.* v. *Crossman*, 76 Maine, 577; *Brown* v. *Heard*, 85 Maine, 294; *Perry* v. *Buswell*, 113 Maine, 399. Nothing appears here to take this case out of this general rule.

Our conclusion therefore is that the plaintiff has not proved title to the flats in question and therefore cannot maintain this action.

*Judgment for defendant.*