MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2023 ME 15
Docket:        Wal-22-19
Argued:        September 8, 2022
Decided:       February 16, 2023

Panel:         STANFILL, C.J., and JABAR, HORTON, CONNORS, JJ., and HUMPHREY, A.R.J.

JEFFREY R. MABEE et al.

v.

NORDIC AQUAFARMS INC. et al.

CONNORS, J.

[¶1]  This is an appeal from a judgment entered by the Superior Court (Waldo County, *R. Murray, J.*) after a bench trial, determining ownership and land use rights in intertidal land bordering Penobscot Bay.  We vacate the judgment, concluding, inter alia, that under the plain language of the governing deeds, the disputed land belongs to Jeffrey R. Mabee and Judith B. Grace.

## I.  BACKGROUND

### A.    Introduction

[¶2]  On one side of this dispute are Nordic Aquafarms Inc. (Nordic), Richard and Janet Eckrote, and the City of Belfast.  In 2018, Nordic announced a plan to develop a land-based salmon aquaculture facility in Belfast.  In furtherance of the plan, Nordic negotiated an agreement with the Eckrotes to

2

bury industrial pipes in the intertidal land located between the Eckrotes' upland property and Penobscot Bay. The Eckrotes claimed that they owned the intertidal land abutting their upland property. In 2021, during the trial, the City bought the Eckrotes' property and was granted intervenor status.

[¶3] On the other side of the dispute are Mabee and Grace, Upstream Watch, and Friends of the Harriet L. Hartley Conservation Area (Friends). Mabee and Grace jointly own property near the Eckrotes' property and claim that they own not only the intertidal land abutting their own upland property but also the intertidal land abutting the upland properties of the Eckrotes, Kenneth and Wendy Schweikert, and Lyndon W. Morgan. Mabee and Grace also seek to enforce a restrictive covenant in the Eckrotes' chain of title and a conservation easement that Mabee and Grace granted to Upstream Watch and that was later assigned to Friends.

[¶4] The Superior Court concluded, inter alia, that Mabee and Grace failed to establish title to the intertidal land abutting the Eckrotes' and Morgan's upland properties. Mabee and Grace, Upstream Watch, and Friends appeal, advancing several arguments, but their principal argument is that the trial court erred in determining the ownership of the disputed intertidal land.

[¶5]  Set forth in Figure 1 is a depiction of the area that is the subject of this litigation.



*Figure 1*

## B.    Factual Background

[¶6]  The following facts are drawn from the parties' stipulated facts and exhibits.  *See Goggin v. State Tax Assessor*, 2018 ME 111, ¶ 3, 191 A.3d 341.

4

### 1. Hartley's Conveyances

[¶7]  In 1935, Harriet L. Hartley became the sole owner of the property that is the subject of this litigation, including the intertidal land.  She subsequently made three relevant conveyances.[1]



*Figure 2*

### a. The Hartley-to-Poor Deed

[¶8]  In January 1946, Hartley conveyed a portion of her property to Fred R. Poor.  The Hartley-to-Poor deed described the property as follows:

> A certain lot or parcel of land situated in Belfast in the County of Waldo and State of Maine, bounded and described as follows, viz: Beginning at the head of a gully in the center of a concrete culvert

---

[1]  Hartley conveyed the portion of her property located on the landward side of the Atlantic Highway (also called Northport Avenue) to the Belfast Water District.  That property is not relevant to this appeal.

which is on or near the Southerly bound of the Atlantic Highway; thence Southeasterly following the bottom of the gully 275 ft. more or less to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully; thence Northerly up the bottom of the said gully 100 ft.; thence West 507 ft. to the center of a gully on or near the Southerly bound of the Atlantic Highway; thence Westerly along the Southerly bound of said highway, 206 ft. to the point of beginning. Said lot contains 2.23 acres, more or less.



*Figure 3*

The property conveyed in the Hartley-to-Poor deed is outlined in red in Figure 3.

[¶9] The Hartley-to-Poor deed also contained the following language:

The lot or parcel of land herein described is conveyed to Fred R. Poor with the understanding it is to be used for residential

purposes only, that no business for profit is to be conducted there unless agreed to by Harriet L. Hartley, her heirs or assigns.

This property was eventually conveyed in part to the Eckrotes and in part to Morgan.

[¶10]   As discussed below, *see infra* ¶¶ 25-44, this deed conclusively establishes that Hartley did not convey any intertidal land to Poor, and, therefore, that the Eckrotes and Morgan do not own the intertidal land abutting their respective upland properties.

### b.     The Hartley-to-Cassida Deed

[¶11]  Next, in October 1946, Hartley conveyed a portion of her property north of Poor's property to Sam W. Cassida.   The Hartley-to-Cassida deed described the waterside boundary of the parcel as the "high water mark of Penobscot Bay" but also conveyed "whatever right, title or interest [Hartley] may have in and to the land between high and low water marks of Penobscot Bay in front of the above described lot."   There is no dispute that the Hartley-to-Cassida deed included an express conveyance of the intertidal land

"in front" of the property. The Cassida property, including the intertidal land conveyed, is outlined by the solid and dashed yellow lines in Figure 4.



*Figure 4*

This property was eventually conveyed, through mesne transfers, in part to the Eckrotes,[2] in part to Morgan,[3] and in part to others.

### c. The Hartley-to-Butlers Deed

[¶12] Finally, in September 1950, Hartley conveyed property to William and Pauline Butler in a deed describing the property as follows:

> A certain lot or parcel of land with the buildings thereon situated in Belfast in the County of Waldo and State of Maine on the easterly

---

[2] The portion of the Eckrotes' upland that traces back to the Hartley-to-Cassida deed is not waterfront property, and the Eckrotes do not claim any interest in the intertidal land through the Hartley-to-Cassida deed.

[3] The waterfront portion of Morgan's property that can be traced back to the Hartley-to-Cassida deed, if any, is not a subject of this appeal.

side of the Atlantic Highway and bounded and described as follows, to wit: Northerly by land of Fred R. Poor, Easterly by Penobscot Bay, southerly by Little River and westerly by the Atlantic Highway, so-called.

As discussed below, *see infra* ¶¶ 45-52, this deed is the essential starting point of the analysis leading to our conclusion that Hartley conveyed to Mabee and Grace's predecessors in interest the intertidal land that is in dispute.

### 2. Subsequent Conveyances of the Butlers' Parcel

[¶13] Also of import are the post-1950 conveyances of the Butlers' parcel. After the Butlers acquired their property from Hartley, they sold it to Ernest and Marjorie Bell. The Bells then sold the property through two conveyances of what would eventually become the Schweikerts' property and Mabee and Grace's property.

[¶14] In the first conveyance, the Bells sold a portion of their property to John and Catherine Grady. The Bells-to-Gradys deed described the waterside boundary as follows:

[T]hence South 48° 20' East one hundred thirty-eight (138) feet, more or less, to an iron pin and continuing on the same course thirty-nine (39) feet, more or less, to the high water mark of Penobscot Bay; thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet, more or less, to an iron pipe; thence turning and running generally northwesterly and following the gully that marks the line between land of Ernest J. Bell and Marjorie N. Bell, and land of Fred R. Poor, to the point of beginning.



*Figure 5*

After several additional transfers using the same description, the Schweikerts came to own this property, which is outlined in blue in Figure 5.

[¶15]  This deed is relevant because it shows that the Bells did not convey any intertidal land to the Gradys, and, therefore, that the trial court's conclusion that the Schweikerts do not own the intertidal land abutting their upland property, which conclusion was not appealed, is correct.

[¶16]  In the second conveyance, after the death of her husband, Marjorie Bell conveyed her remaining interest to Willis and Virginia Trainor. The Bell-to-Trainors deed recited the same description as the one used in the

1950 Hartley-to-Butlers deed, excepting the land that the Bells had transferred to the Gradys in the first conveyance. The Trainors' property was thereafter transferred to various owners using the same language, until it was acquired by Mabee and Grace.

[¶17] This chain, beginning with the Hartley-to-Butlers deed, shows that Mabee and Grace own the intertidal land abutting their own upland property and the intertidal land abutting the upland properties of the Schweikerts, the Eckrotes, and Morgan. Mabee and Grace's property is outlined in the solid and dashed green lines in Figure 5.

C.      **Procedural Background**

[¶18] In 2019, Mabee and Grace filed a complaint against Nordic and the Eckrotes requesting a declaratory judgment and injunctive relief and seeking to quiet title. Nordic and the Eckrotes answered and counterclaimed. Friends was later added as a plaintiff; Upstream Watch, the Schweikerts, and Morgan joined as parties in interest. The active parties[4] engaged in a period of significant motion practice including more than a dozen competing motions to

---

[4] A year before trial, the Schweikerts filed a motion to substitute Nordic on all claims related to the Schweikerts, which the court granted. At trial, Morgan did not personally appear but was represented by counsel. Morgan's counsel did not question any witnesses or offer any evidence.

dismiss, motions for summary judgment, and motions for judgment on the pleadings. The trial court denied all dipositive motions.

[¶19] After amending their complaint, Mabee and Grace and Friends eventually pleaded five claims against Nordic and the other landowners: declaratory judgment (Count 1), quiet title (Count 2), injunctive relief (Counts 3 and 4), and slander of title (Count 5). Nordic asserted two counterclaims: declaratory judgment (Count 1) and tortious interference with an advantageous relationship (Count 2). The Eckrotes asserted seven counterclaims: declaratory judgment (Count 1), title by adverse possession (Count 2), slander of title (Count 3), trespass (Count 4), boundary by acquiescence (Count 5), quiet title (Count 6), and tortious interference with an advantageous relationship (Count 7).

[¶20] By agreement of the parties, the court scheduled a bifurcated trial in which the first portion of the trial would address the title claims and the second portion of the trial would address the tort claims. During a three-day bench trial in June 2021, the court viewed the property and heard testimony from Mabee and Grace's surveyor, Nordic's surveyor, Janet Eckrote, and two representatives from Nordic. The parties offered numerous exhibits and stipulations on the title issues.

12

[¶21] On October 28, 2021, the court entered a partial judgment in favor of Mabee and Grace on Counts 1 and 2 of their complaint, concluding that they own the intertidal land fronting their upland and the Schweikerts' upland. The court entered judgment in favor of the Eckrotes on Counts 1 and 6 of their counterclaims and determined that Counts 2 and 5 were moot. The court entered judgment in favor of Nordic on Count 1 of its counterclaims. Finally, the court denied Mabee and Grace's and Friends' request for injunctive relief as to Counts 3 and 4 of their complaint. The trial court directed that its decision be entered as a final judgment pursuant to M.R. Civ. P. 54(b)(1).

[¶22] Mabee and Grace, Upstream Watch, and Friends filed timely motions for amended and additional findings and to amend the judgment, which the trial court denied. *See* M.R. Civ. P. 52(b), 59(e). Mabee and Grace, Upstream Watch, and Friends timely appealed. *See* 14 M.R.S. § 1851 (2022); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

### A. The judgment is reviewable under M.R. Civ. P. 54(b)(1).

[¶23] Because this appeal is taken from a judgment that did not dispose of all claims against all parties, we must first determine whether the appeal is proper. *See Stiff v. Jones*, 2022 ME 9, ¶ 8, 268 A.3d 294.

[¶24]  Rule 54(b)(1) provides in relevant part that "when more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims."  To meet the requirements of the rule, the trial court, in certifying the judgment, must expressly determine that "there is no just reason for delay."  *Id.*  Here, the court stated such, and we agree that it was reasonable to certify the judgment as final, given that the court had decided all issues relating to the ownership and use rights, with only tort claims remaining.  We therefore accept the appeal. *See McClare v. Rocha*, 2014 ME 4, ¶ 8, 86 A.3d 22 ("We review a trial court's certification of a partial final judgment [pursuant to M.R. Civ. P. 54(b)(1)] for an abuse of discretion but do not simply accept the trial court's determination; there must be a valid justification for the determination.").

**B.**    **The Hartley-to-Poor deed severed the upland from the intertidal land.**

[¶25]  As the trial court correctly observed, for Mabee and Grace to be successful on their claim that they own the intertidal land fronting the Eckrotes' upland, they had to establish that (1) the Hartley-to-Poor deed severed the intertidal land from the upland and (2) the intertidal land was conveyed to Mabee and Grace through their predecessors in interest, beginning with the

Hartley-to-Butlers deed. *See Hodgdon v. Campbell*, 411 A.2d 667, 671 (Me. 1980) ("[T]he plaintiff in a quiet title action has the burden of proving better title than that of the defendant.").

> **1. The rules of construction applicable to the interpretation of the Hartley-to-Poor deed include those relating to the construction of deed language conveying intertidal land.**

[¶26]   "Construction of a deed is a matter of law . . . , and the Superior Court's construction of the terms of the deed is a legal determination open to corrective appellate review." *Sylvan Props. Co. v. State Plan. Off.*, 1998 ME 106, ¶ 8, 711 A.2d 138 (citation and quotation marks omitted); *see also Hodgdon*, 411 A.2d at 672 ("What are the boundaries is a question of law, and where the boundaries are is a question of fact." (quotation marks omitted)). Thus, "we review de novo the interpretation of a deed and the intent of the parties who created it, including whether the deed contains an ambiguity." *Almeder v. Town of Kennebunkport*, 2019 ME 151, ¶ 26, 217 A.3d 1111 (alteration and quotation marks omitted). "When interpreting a deed whose terms are not ambiguous, we do not speculate about the grantors' actual or probable objectives; rather, we focus on what is expressed within the four corners of the deed." *Sleeper v. Loring*, 2013 ME 112, ¶ 16, 83 A.3d 769. "Examination of extrinsic circumstances surrounding execution of a deed is

only proper when the language of the deed is ambiguous and the intention of the parties is in doubt." *Sylvan Props. Co.*, 1998 ME 106, ¶ 8, 711 A.2d 138.

[¶27] Two rules of construction applicable to the interpretation of deed language relating to intertidal land are of importance here. First, the owner of upland oceanfront property presumptively owns to the low-water mark by operation of the Massachusetts Colonial Ordinance of 1641-47. *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111; *Ogunquit Beach Dist. v. Perkins*, 138 Me. 54, 60, 21 A.2d 660 (1941). Because intertidal land may be conveyed separately from the upland, however, an owner benefits from this presumption only when the grant of property expressly includes a call to the water. *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111. "Terms such as 'Atlantic Ocean,' 'ocean,' 'cove,' 'sea,' or 'river' are calls to the water that trigger the presumption." *Id.* (citations omitted). "However, language limiting a grant 'to' or 'by' the shore, beach, bank, or sea shore may defeat the presumption." *Id.*

[¶28] Second, "where the two ends of a line by the shore are at [the] high water mark, in the absence of other calls or circumstances showing a contrary intention, the boundary will be construed as excluding the shore." *Whitmore v. Brown*, 100 Me. 410, 416, 61 A. 985 (1905).

**2.  Under the relevant law, the Hartley-to-Poor deed did not convey to Poor the intertidal land in front of the Eckrotes' upland.**

[¶29]  We recap the relevant calls in the Hartley-to-Poor deed:

> A certain lot or parcel of land situated in Belfast in the County of Waldo and State of Maine, bounded and described as follows, viz: Beginning at the head of a gully in the center of a concrete culvert which is on or near the Southerly bound of the Atlantic Highway; thence Southeasterly following the bottom of the gully 275 ft. more or less to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully; thence Northerly up the bottom of the said gully 100 ft.; thence West 507 ft. to the center of a gully on or near the Southerly bound of the Atlantic Highway; thence Westerly along the Southerly bound of said highway, 206 ft. to the point of beginning.  Said lot contains 2.23 acres, more or less.

The calls that lead us to conclude that Hartley did not convey any intertidal land to Poor are as follows: (a) "275 ft. more or less" southeasterly from the culvert, (b) "to an iron bolt," (c) "in the mouth of a brook," (d) "along high water mark," (e) "410 ft. more or less," and (f) "to a stake at the outlet of a gully."

**a.  "275 ft. more or less"**

[¶30]  The parties do not dispute the location of the point of beginning—namely, the center of a concrete culvert at the head of a gully on the southerly bound of the Atlantic Highway.  From there, the call unambiguously describes a monument, a course, and a distance—the bottom of the gully; southeasterly;

and 275 feet, more or less.  This description is sufficiently clear to locate the boundary without the aid of extrinsic evidence.[5]

### b.   "to an iron bolt"

[¶31]  There is no disagreement that the iron bolt referenced in the deed is missing.  Its disappearance is not critical, however, given that the deed contains other calls by which the boundary can be located.  *See Baptist Youth Camp v. Robinson*, 1998 ME 175, ¶ 10, 714 A.2d 809 (recognizing that "artificial monuments are easily removed").  The parties also stipulated that the "iron bolt" referenced in the Hartley-to-Poor deed had been in the same general location as the "iron pipe" referenced in the Bells-to-Gradys deed—*and that this location was at the high-water mark*.  Relying in part on this stipulation, the trial court concluded, in a ruling that has not been appealed, that the Schweikerts do not own the intertidal land abutting their property because the Bells-to-Gradys deed severed the intertidal land from the upland. *See Whitmore*, 100 Me. at 415, 61 A. 985 (concluding that a deed did not convey the intertidal land in part

---

[5]  Mabee and Grace's surveyor testified that he measured the distance from the undisputed point of beginning to the high-water mark as being 290 feet.  Nordic's surveyor did not testify that he measured this distance, but his survey, which was admitted in evidence, marks this distance as 275 feet, plus or minus.  Both surveyors determined that the distance from the high-water mark to the low-water mark was at least 500 feet, meaning the total distance from the undisputed point of beginning to the low-water mark would be at least 775 feet, significantly longer than the 275-foot call in the deed.

18

because the description began at the corner of a neighboring parcel that was located at or above the high-water mark).

[¶32]  The call also states "*to* an iron bolt."  (Emphasis added.)  "'To' is a word of exclusion."  *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996).  "[A] line running 'to' an object excludes that object."  *Id.* at 514-15 (concluding that "to a point on the northerly shore" called for a terminus at the high-water mark and that the flats were excluded where it was followed by "thence easterly on and by said northerly shore").[6]

[¶33]  The call "to an iron bolt" that is located at the high-water mark, consistent with the parties' agreement and the trial court's conclusion that was not appealed, indicates that a severance was intended.

### c.      "mouth of a brook"

[¶34]  The area in dispute is subject to large tidal fluctuation, and the parties disagree whether the location of the "mouth of a brook" can shift with the tide.  Although the location of the mouth of a brook is a question of fact, what constitutes a "mouth of a brook" is a question of law.  *See Almeder*, 2019 ME 151, ¶¶ 31-32, 217 A.3d 1111.

---

[6]  Notably, if the iron bolt were located anywhere significantly below the high-water mark, then it would not only be concealed below the water most of the time but also would be subject to the strong tidal currents of the Penobscot Bay.  It seems highly improbable that the iron bolt would have been placed in such a location.

[¶35]  We have had occasion to define geographical features in actions involving real property, especially those involving waterfront properties, *see id.*, but we have never defined the phrase "mouth of a brook."  We need not look far for a definition of the term "brook" because it is defined by statute.  A "brook" is "a channel between defined banks."  38 M.R.S. § 480-B(9) (2022).[7]  Thus, when the banks cease to exist, so too does the brook.  In this context, the term "mouth" simply identifies the "exit or point of discharge" of the brook, U.S. Dep't of the Interior, Glossary of BLM Surveying and Mapping Terms 106 (2003), and, given the definition of "brook," cannot be located below the upland banks.  Thus, the "mouth of a brook" is a fixed point defined by the upland boundary, and the call does not shift with the tide.

[¶36]  Based on these definitions, there is no ambiguity on the face of the deed regarding what constitutes the "mouth of a brook."[8]

---

[7]  Title 38 M.R.S. § 480-B(9) (2022) is contained within the Natural Resources Protection Act, under which the Department of Environmental Protection regulates water bodies.  *See* 38 M.R.S. § 480-A (2022).

[8]  Nordic's surveyor asserted at trial that the "mouth of a brook" is "basically where the flowing water body . . . enters the receiving water body," and, therefore, the mouth of a brook moves with the ebb and flow of the tide.  Applying this construction of the term to deed language is impractical in at least two respects.  First, it is dependent on the presence of flowing water in the brook, which may not, in fact, be present.  *See* 38 M.R.S. § 480-B(9) (listing the characteristics of a "channel" within the definition of "brook").  Second, regardless of where the bodies of water meet, the iron bolt referenced in the deed would not have moved with each ebb and flow of the tide.  Although immaterial to our analysis because we find the deed language clear, Mabee and Grace's surveyor's definition of "mouth of a brook" was similar to the statutory definition discussed above.  He testified that there is a clear

### d.  "along high water mark"

[¶37]  The parties dispute whether "along high water mark" is a call to the water.  This again is a question of law.

[¶38]  In *Hodgdon*, 411 A.2d at 672, we stated that, as a matter of law, a deed reference "by the shore" called for a measurement "along the contour of the high-water mark."  It stands to reason, then, that a deed reference "along high water mark" is equivalent to "by the shore."  *See id.*; *Lapish v. President of Bangor Bank*, 8 Me. 85, 90 (1831) ("Now, as high-water mark is one side of the sea-shore or flats, and low-water mark is the other, and as a deed bounding land on one side by the shore, does not convey the flats, it is perfectly clear that a *deed bounding a piece of land by high-water mark*, which is one side of the shore, cannot be construed as conveying the flats." (emphasis added)); *see also Whitmore*, 100 Me. at 414, 61 A. 985.  Terms often used as evidence of intent to sever the intertidal land from the upland include "along high water mark" and "by the shore."  Donald R. Richards & Knud E. Hermansen, *Maine Principles of Ownership Along Water Bodies*, 47 Me. L. Rev. 35, 52 (1995).

[¶39]  Further, when a description begins at a known monument on the upland and runs by the shore based on given courses and distances, the shore

---

distinction between the mouth of the brook and the bay, and he located the mouth of the brook at the high-water mark.

is excluded, and the boundary runs only to the high-water mark. *Sinford v. Watts*, 123 Me. 230, 232-33, 122 A. 573 (1923); *see also Montgomery v. Reed*, 69 Me. 510, 513-14 (1879).

[¶40] In sum, this language does not reflect a call to the water but rather severance of the upland.

### e. "410 ft. more or less"

[¶41] Here, the call of "410 ft. more or less" is a distance described in definite, unambiguous terms.

[¶42] As with the call of "275 ft. more or less" noted above, the uncontradicted calculation of the distance between the mouth of the brook starting at the high-water mark and the stake at the outlet of a gully is within two or three feet of the 410 feet called for in the deed. If the mouth of the brook were located at the low-water mark, then the distance would be significantly longer than 410 feet.

### f. "to a stake at the outlet of a gully"

[¶43] The waterside boundary ends with a call "to a stake at the outlet of a gully." This term, like the ones before it, is clear on its face, and the parties do not appear to have a genuine dispute that the outlet of the gully is, in fact, located at or above the high-water mark. *See Whitmore*, 100 Me. at 415,

61 A. 985 (stating that the shore is excluded when the termini of a line by the shore are located at the high-water mark).

[¶44]  To summarize, each call in the Harley-to-Poor deed consistently points to the high-water mark.  We need go no further than the unambiguous deed language to conclude, as a matter of law, that the Hartley-to-Poor deed did not convey the intertidal land abutting the Eckrotes' property.[9]

**C.    The Hartley-to-Butlers deed conveyed the intertidal land in front of the Eckrotes' upland to the predecessors in interest of Mabee and Grace.**

[¶45]  Because we conclude, based on the unambiguous language in the Hartley-to Poor deed, that Hartley severed the intertidal land from the upland when she conveyed a portion of her property to Poor, the Eckrotes' claim of title to the intertidal land fronting their property fails.  This does not end the inquiry, however, because we must determine whether Mabee and Grace established title to that intertidal land.

---

[9]  Again, although the extrinsic evidence in the record is immaterial, we observe that all the surveyors—including the Eckrotes' surveyor in 2012 and Nordic's surveyor before he changed his position to one that was favorable to Nordic—read the Hartley-to-Poor deed as excluding the intertidal land.  Also, the Hartley-to-Cassida deed, conveying a portion of Hartley's property only months after the Hartley-to-Poor conveyance, used strikingly different language to make clear that the intertidal land was included in that conveyance.  *See supra* ¶¶ 8, 11.

1. **The rules of construction applicable to the interpretation of the Hartley-to-Butlers deed include those relating to the interpretation of adjoiners' or abutters' deeds.**

[¶46] The Hartley-to-Butlers deed provides in relevant part:

A certain lot or parcel of land with the buildings thereon situated in Belfast in the County of Waldo and State of Maine on the easterly side of the Atlantic Highway and described as follows, to wit: Northerly by land of Fred R. Poor; easterly by Penobscot Bay; southerly by Little River and westerly by the Atlantic Highway, so-called.

[¶47] In Maine, it is common practice "to describe land 'by adjoiners'— that is, by reference to the boundaries of adjoining owners." Paul G. Creteau, *Maine Real Estate Law* 206 n.60 (1969). Adjoiners' deeds are also known as abutters' deeds. *See Markley v. Semle*, 1998 ME 145, ¶ 7 n.2, 713 A.2d 945 (noting that "abutter[s'] deeds" are "deeds that do not set forth precise distances or bearings but rather describe the limits of property in terms of the adjoining parcels of land").

[¶48] "The rule is well settled that the land of an adjacent owner is a monument, and boundaries are controlled, in descending priority, by monuments, courses, distances, and quantity, unless this priority produces absurd results." *Harborview Condo. Ass'n v. Pinard*, 603 A.2d 872, 873 (Me. 1992) (citation and quotation marks omitted); *see also Snyder*, 679 A.2d at 514. Other calls in a deed must give way to the line of an adjacent tract if the

line is "established and known" because such a boundary is "usually considered more certain, being at a fixed and definite place." *Howe v. Natale*, 451 A.2d 1198, 1206 (Me. 1982) (Carter, J., concurring in part and dissenting in part) (quotation marks omitted); *see also Rusha v. Little*, 309 A.2d 867, 870 (Me. 1973) ("One who accepts a deed describing his land in terms of an adjoining tract is bound by the prior tract as a boundary and a monument . . . .").

[¶49] "The rule of deed construction that monuments control over [other calls] is not an arcane relic of medieval conveyancing, but a rule conforming with common sense and the likely intent of the grantor." *Edmonds v. Becker*, 434 A.2d 1012, 1013 (Me. 1981). "The intent of the parties is the principal guide to deed construction, and the law reasonably assumes that where a call in a deed runs to the land of an abutter, the grantor intended to convey the entire parcel to that point, and not to retain title in a narrow slice of land." *Id.* (citation omitted).

2. **Under the relevant law, the Hartley-to-Butlers deed conveyed the intertidal land in front of the Eckrotes' upland to the predecessors in interest of Mabee and Grace.**

[¶50] Unlike the Hartley-to-Poor deed, the Hartley-to-Butlers deed *does* contain a call to the water—"easterly by Penobscot Bay"—thus triggering the presumption of the Colonial Ordinance. *See Almeder*, 2019 ME 151, ¶ 37,

217 A.3d 1111. After the property was sold to the Butlers, it was then conveyed to the Bells, the Trainors, and so on, until it was acquired by Mabee and Grace. Each of these subsequent conveyances iterated the same call to the water.[10]

[¶51] Nordic contends that if Hartley severed the intertidal land from the upland when she conveyed a portion of her property to Poor, then the intertidal land in front of the Poor property was never conveyed, and Hartley's heirs inherited it. But the plain language of the Hartley-to-Butlers abutters' deed indicates that Hartley conveyed all the disputed intertidal land to Mabee and Grace's predecessors in interest. The law related to abutters' deeds has two important consequences when applied here. First, the location of the boundary between Hartley's property and Poor's property would have been "established and known" to Hartley as the common grantor, and, therefore, the Hartley-to-Butlers deed must give way to the Poor boundary as the adjacent tract. *See Howe*, 451 A.2d at 1206 (Carter, J., concurring in part and dissenting in part). The "Northerly by land of Fred R. Poor" reference in the Hartley-to-Butlers deed signifies that the boundary runs along the length of the Poor property and not merely along the portion between the Atlantic Highway

---

[10] The trial court correctly applied this rule of construction when it determined that Mabee and Grace established title to the intertidal land fronting their property and the Schweikerts' property, which ruling was not appealed.

and the high-water mark. Second, the law presumes that, by using an abutters' deed, Hartley intended to convey her entire parcel and not retain title in a narrow strip of land to which she would have no access. *See Edmonds*, 434 A.2d at 1013.

[¶52] In sum, once it is understood that the Hartley-to-Poor deed did not convey the disputed intertidal land, under the relevant legal principles, the language in the Hartley-to-Butlers abutters' deed unambiguously conveyed the disputed land to Mabee and Grace's predecessors in interest.[11]

## D. The restrictive covenant imposed on the Eckrote upland by the Hartley-to-Poor deed runs with the land.

[¶53] As noted above, *see supra* ¶ 9, the Hartley-to-Poor deed restricts the use of the conveyed property to "residential purposes only." Mabee and Grace argue that this restriction runs with the land, i.e., binds the successor owners of the land. Adhering to the modern view of restrictive covenants as expressed in the Restatement (Third) of Prop.: Servitudes ch. 4 (Am. L. Inst. 2000), we agree.

[¶54] Referring generally to "servitudes," which are legal devices that create a right or an obligation that runs with land, the Restatement properly

---

[11] Again, although we need not look to extrinsic evidence, we observe that Hartley's probate file contains a note indicating that she conveyed all her real property during her life.

orients the focus of the inquiry on the parties' intent. *Id.* §§ 1.1, 4.1. That intent should be ascertained from the language used in the instrument or the circumstances surrounding the creation of the servitude, and the servitude should be construed in a manner that carries out the purpose for which it was created. *Id.* § 4.1(1).

[¶55]  This rule "departs from the often expressed view that servitudes should be narrowly construed to favor the free use of land." *Id.* § 4.1 cmt. a. Instead, "[u]se restrictions on property are valid . . . so long as there is some rational justification for the restriction." *Id.* § 3.5 cmt. d; *see also Green v. Lawrence*, 2005 ME 90, ¶ 11, 877 A.2d 1079 (holding that a restrictive covenant limiting the development of property was not unreasonable).

[¶56]  Here, the restrictive covenant in the Hartley-to-Poor deed reads:

> The lot or parcel of land herein described is conveyed to Fred R. Poor with the understanding it is to be used for residential purposes only, that no business for profit is to be conducted there unless agreed to by Harriet L. Hartley, her heirs or assigns.

[¶57]  This servitude is not unreasonable, either on its face or in the context of the specific land on which the limitation is imposed. Also, when in

doubt, servitudes are to be construed to be appurtenant rather than in gross.[12]

*See French v. Est. of Gutzan*, 2015 ME 152, ¶ 10, 128 A.3d 657. More specifically,

the burden to remain residential imposed on Poor's parcel was more beneficial

to Hartley's successors in interest than to Hartley personally, supporting the

conclusion that this benefit is appurtenant. Restatement (Third) of Prop.:

Servitudes § 4.5(1)-(2). Finally, the servitude references "heirs" and "assigns,"

reflecting an intent to bind successors. *See* 9 Michael A. Wolf, *Powell on Real

Property* § 60.04[3][b], Lexis (database updated December 2022) (stating that

such language "constitutes strong evidence of the devolutive intent").[13]

[¶58] In sum, the restriction to "residential purposes only," benefiting

the holder of the land now owned by Mabee and Grace, runs with the land

conveyed to Poor, binding Poor's successors.

---

[12] As the Restatement (Third) of Prop.: Servitudes § 1.5 (Am. L. Inst. 2000) explains:

> (1) "Appurtenant" means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land. The right to enjoyment of an easement or profit, or to receive the performance of a covenant that can be held only by the owner or occupier of a particular unit or parcel, is an appurtenant benefit. A burden that obligates the owner or occupier of a particular unit or parcel in that person's capacity as owner or occupier is an appurtenant burden.

> (2) "In gross" means that the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land.

"Only appurtenant benefits and burdens run with land . . . ." *Id*. § 1.5 cmt. a.

[13] As successors in interest to Hartley's benefitted property, Mabee and Grace have standing to enforce the covenant. *See* Restatement (Third) of Prop.: Servitudes § 1.3 cmt. d ("[I]f the benefit runs with land, a successor to the land may enforce without assignment . . . .").

**E.** **Injunctive relief to enforce the conservation easement is not mandated.**

[¶59] In 2019, Mabee and Grace created a conservation easement over their intertidal land. They granted the easement to Upstream Watch, which later assigned the easement to Friends. Simplifying the trial court's ruling for the purposes of our analysis, the court denied injunctive relief to enforce the conservation easement on the grounds that Mabee and Grace (1) failed to establish title to the intertidal land fronting the Eckrotes' and Morgan's upland properties and therefore did not have a valid conservation easement on that property and (2) failed to offer sufficient evidence that the parties on the Eckrotes' side were engaging in any activity on Mabee and Grace's intertidal land in violation of the conservation easement. We review the denial of a request for injunctive relief for abuse of discretion. *See Rice v. Cook*, 2015 ME 49, ¶ 17, 115 A.3d 86.

[¶60] Because we conclude that Mabee and Grace own the intertidal land in dispute, the parties on the Eckrotes' side of the dispute have only the same rights as any members of the public to enter onto this land. Given that injunctions are forward looking, however, and the record contains no evidence to suggest an unwillingness on the part of any party to accept the judicial determination of the ownership rights in the disputed property, there is no

need for us to revisit the issue whether injunctive relief should have been granted. *Cf. Flaherty v. Muther*, 2011 ME 32, ¶ 70 n.12, 17 A.3d 640 (concluding that the plaintiffs' claim of interference with the use of an easement was not ripe for adjudication but that, if the defendants unreasonably interfered with the use of the easement in the future, the remedy of injunctive relief might then be available); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995) ("[T]he fact of past injury, while presumably affording the plaintiff standing to claim damages, does nothing to establish a real and immediate threat that he would again suffer similar injury in the future." (alterations and quotation marks omitted)).

### III. CONCLUSION

[¶61] For the reasons given above, we hold that the deed conveying land to Poor did not include the intertidal land and that this intertidal land was eventually conveyed to Mabee and Grace. Mabee and Grace additionally hold an enforceable servitude over the Eckrotes' upland. Finally, although Friends holds an enforceable conservation easement over the intertidal land, injunctive relief to enforce the easement is not mandated under the circumstances presented.

The entry is:

> Judgment vacated.  Remanded to the trial court
> for proceedings consistent with this opinion.

---

Kimberly J. Ervin Tucker, Esq. (orally), Lincolnville, for appellants Jeffrey R. Mabee, Judith B. Grace, and Friends of the Harriet L. Hartley Conservation Area

David J. Perkins, Esq. (orally), Curtis Thaxter LLC, Portland, for appellant Upstream Watch

Kristin M. Collins, Esq., Stephen E.F. Langsdorf, Esq., Sigmund D. Schutz, Esq., and Cameron Ferrante, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, for appellee City of Belfast

Andre G. Duchette, Esq., and Gregg R. Frame, Esq., Taylor, McCormick & Frame, LLC, Portland, for appellees Richard and Janet Eckrote

David M. Kallin, Esq. (orally), and Melissa A. Hewey, Esq., Drummond Woodsum, Portland, for appellee Nordic Aquafarms Inc.

Waldo County Superior Court docket number RE-2019-18
FOR CLERK REFERENCE ONLY